**In re PETITION FOR DISCIPLINARY ACTION AGAINST Richard Edward EDINGER, a Minnesota Attorney, Registration No. 263965.**

**No. A04–1276.**

Supreme Court of Minnesota.

July 28, 2005.

Kenneth L. Jorgensen, Director, Craig Donald Klausing, Senior Assistant Director, St. Paul, MN, for Appellant.

Bruce Douglas Quick, Fargo, ND, for Respondent Edinger.

## OPINION

PER CURIAM.

The Director of the Office of Lawyers Professional Responsibility made inquiries concerning a series of overdrafts from the trust account of attorney Richard Edward Edinger. When Edinger failed to timely respond to those inquiries and then responded minimally, the Director began a formal disciplinary investigation. During that investigation, Edinger made a series of false statements concerning the nature of the funds deposited in his trust account and why the overdrafts occurred. The Director filed a petition for disciplinary action, alleging both trust account violations and noncooperation with the investigation.[1] Edinger waived a panel proceeding. A referee was appointed and, after a hearing, recommended that Edinger be suspended for 3 months. The Director disagreed with the referee's recommendation and requested this court's review. We accept the referee's recommendation and determine that Edinger has committed serious misconduct warranting indefinite suspension from the practice of law, with no right to apply for reinstatement for at least 3 months.

Edinger was admitted to practice in Minnesota on May 10, 1996, and also admitted to practice in North Dakota in October 1996. Edinger practices in the Fargo–Moorhead area and focuses his practice on family law and contract public defender work for Cass County, North Dakota.

On January 14, 2002, the Director received a notice pursuant to Minn. R. Prof. Conduct 1.15(j)-(o) that Edinger's trust account was overdrawn on January 4, 2002.

The Director wrote to Edinger on January 15 requesting an explanation for the overdraft and certain documents related to the trust account. Edinger contacted the Director on January 16 to give notice that his trust account was again overdrawn and to request that the Director mail him a copy of the informational trust account brochure. Edinger did not respond to the Director's January 15 letter. On January 23, the Director received a notice that confirmed a January 15 overdraft on Edinger's trust account.

The Director mailed a second letter on February 8, 2002, to Edinger requesting that he explain the January 4 overdraft. The Director received a fax from Edinger stating that Edinger had mailed his response that same day, but Edinger had not done so. On February 15 and 16, Edinger sent two faxes to the Director containing his explanation for the January 4 overdraft and supporting documentation. Edinger informed the Director that the January 4 overdraft resulted from a delay in depositing a $650 retainer check from a client, W.R. Edinger included a handwritten client subsidiary ledger documenting W.R.'s payment of the retainer. He also explained that the January 15 overdraft was caused by an inadvertent delay in depositing an $840 payment from W.R. for the hiring of an expert witness.

The Director received another notice that Edinger's trust account was overdrawn on April 15, 2002. The Director wrote to Edinger on April 22 requesting an explanation for the April 15 overdraft and supporting documents, including Edinger's trust account bank statements and

---

1. The Director alleges that Edinger violated Minn. R. Prof. Conduct 1.15(a) by using his trust account for personal purposes; rule 1.15(h) for failing to maintain proper trust account client subsidiary ledgers, trial balances, and reconciliations; rule 8.1(a)(1) for making false statements in an investigation; rule 8.1(a)(3) for failing to cooperate with the Director; and rules 8.4(c) and (d) for preparing and submitting fictitious client trust ledgers.

client subsidiary ledgers from February through April 2002. By early May 2002, the Director had not received a response from Edinger and the Director sent Edinger a follow-up request on May 13. Edinger responded to the Director's request by fax on May 28. The Director also received Edinger's response by mail on June 7, 2002, but the response was incomplete because it included only Edinger's April 2002 trust account bank statement. Edinger attributed the April 15 overdraft to the deposit of a check from a client, P.B., that was returned for insufficient funds after Edinger had made expenditures related to P.B.'s case. Edinger included with his explanation a signed statement from P.B. that authorized Edinger to withdraw funds from the client trust account to cover expenses incurred by Edinger's representation of P.B.

The Director wrote to Edinger on June 21, requesting that Edinger submit his May 2002 trust account bank statement, his client subsidiary ledgers, and the trust account check that caused the April 15 overdraft. Edinger responded by fax on July 8, 2002, and informed the Director that the requested documentation had been mailed and that his delay in responding was due to his having been on vacation when the June 21 letter was received. The only document that the Director received from Edinger was a signed statement from a client that the client's insufficient funds check had caused the April 15 overdraft.

On July 9, 2002, the Director received a notice that Edinger's trust account was again overdrawn as of July 8. The Director wrote to Edinger on July 10, requesting an explanation for the July 8 overdraft and supporting documentation. The Director also sent a letter to Edinger on July 11 noting that Edinger had failed to fully respond to the Director's June 21 request

and instructing Edinger to appear at a meeting with the Director on August 6, 2002, to discuss the overdrafts. Edinger attended the August 6 meeting and informed the Director that he had closed his client trust account. Edinger also stated that he had mistakenly believed that his secretary had mailed the documents that the Director had requested in the June 21 letter. The Director requested that Edinger provide his trust account bank statements and client subsidiary ledgers from April through August 2002, as well as an explanation for the July 2002 overdraft. Edinger partially responded to the Director's request on August 13 by faxing to the Director his July and August trust account bank statements.

On August 22, the Director received from Edinger: (1) a statement from Edinger that the July 8 overdraft resulted from a bookkeeping error; (2) the May through July 2002 trust account bank statements; (3) the subsidiary client ledgers for four clients, P.B., P.D., T.E. and D.M.; and (4) a signed statement from P.B. The P.B. ledger reflected the issuance of several trust account checks for "investigative" and "travel" expenses, an April 22, 2002, cash retainer and a June 8, 2002, $1,292 deposit described as a "Retainer for Investigator (cash)." The Director observed that Edinger's trust account bank statements reflected significant activity not reflected in Edinger's subsidiary client ledgers.

The Director initiated a formal disciplinary investigation. The Director wrote to Edinger on September 16, 2002, requesting that within 14 days Edinger provide complete trust account books and records from January 1, 2001, to August 30, 2002. By October 25, the Director had not received the requested documentation from Edinger. The Director sent a letter to Edinger instructing him to appear for a

meeting on November 12, 2002, and to bring the requested documentation with him. On November 12, Edinger faxed a letter to the Director requesting that the meeting be rescheduled for November 14 or 15. The meeting was rescheduled for November 14, but Edinger failed to attend and did not explain his absence to the Director.

In February 2003, the Director called Edinger to schedule a meeting for February 19 and to encourage him to participate in the investigation process. Edinger attended the meeting and acknowledged that he had not maintained the proper records and that he had used the trust account as a personal account. Edinger produced trust account bank statements for most of the requested period of January 2001 through August 2002, and copies of some trust account checks. The trust account bank statements not produced were for May through July 2001 and for September 2001.

At the February 19 meeting, the Director had requested that by March 5, 2003, Edinger provide a reconstructed trust account checkbook register, missing bank statements, and his original trust account checks. The Director received the missing trust account bank statements and some of Edinger's original trust account checks on March 7. In the cover letter of Edinger's March 7 response, Edinger wrote that he had requested the missing cancelled checks and deposit slips, forwarded all originals to the Director, and completed 90% of the reconstructed trust account checkbook register. Edinger also admitted to violating the Minnesota Rules of Professional Conduct by using the trust account to pay his personal expenses and failing to keep appropriate trust account records.

The Director called Edinger on March 21 to request that he send all information that he had received since his last submission on March 7. Edinger agreed to provide that information to the Director but failed to do so. On April 1, 2003, the Director wrote to Edinger again and requested his appearance at an April 10 meeting. On April 10, Edinger's attorney informed the Director that he would represent Edinger in the Director's proceedings from that point forward. By January 23, 2004, Edinger's attorney had provided the Director with most of the requested documentation.

Ultimately, Edinger acknowledged that he had falsified the documentation that he submitted to the Director in order to conceal his misuse of the trust account. Edinger's representations to the Director about W.R. were false. W.R. was Edinger's former girlfriend and not a client. The $650 deposit into the trust account in her name was a personal loan to Edinger, not a retainer. Edinger admitted that the $840 deposit attributed to W.R. was actually a personal loan to Edinger by another attorney. Edinger also acknowledged that the checks and deposits attributed to P.B. had nothing to do with P.B., but were fabricated to conceal his misuse of the client trust account for personal expenses.

The client subsidiary ledgers for P.D. indicated that Edinger had received a $1,500 settlement check on P.D.'s behalf and had subsequently issued P.D. a trust account check for the same amount. However, Edinger had not received any such funds on P.D.'s behalf. The payment made to P.D. was to settle a dispute over the adequacy of Edinger's representation.

Likewise, the client subsidiary ledger for T.E. indicated that Edinger had received a $1,208.92 settlement payment on T.E.'s behalf. The ledger reflected that Edinger had paid the $1,208.92 settlement benefits to T.E. Edinger had not received a settlement payment on T.E.'s behalf. In

fact, the $1,208.92 payment to T.E. was paid to resolve a dispute about the adequacy of Edinger's services.

The client subsidiary ledger for D.M. was also false. According to the ledger, Edinger received $2,500 on D.M.'s behalf, and then issued her a check for that same amount. But Edinger did not receive funds on D.M.'s behalf. Edinger issued D.M. a trust account check for $2,500 to resolve a dispute about the adequacy of Edinger's representation.

On July 14, 2004, the Director filed a petition for disciplinary action. The Honorable Bruce W. Christopherson, Eighth Judicial District, was appointed referee. The referee issued his findings, conclusions and recommendation for discipline on December 27, 2004. The referee found that between January 2001 and August 2002

> [Edinger] inappropriately used his trust account as a business/personal account by: (a) disbursing numerous trust account checks in direct payment of personal and/or business expenses; (b) repeatedly depositing his own funds into the account to pay his tax obligations, his secretary's salary and other personal and/or business expenses; and (c) making cash withdrawals from the account.

The referee further found that Edinger had not complied with Lawyers Professional Responsibility Board Opinion No. 9 from "at least January 2001 to August 2002" by failing to maintain proper trust account client subsidiary ledgers, trial balances, and reconciliations.

To arrive at a recommendation for discipline, the referee considered factors weighing positively in favor of and negatively against Edinger. The positive factors considered were (1) the lack of prior discipline, (2) the lack of actual monetary loss or risk of loss to any client, (3) that none of the funds removed from the trust account should have remained in the trust account, and (4) the relatively small amounts at issue. The negative factors considered were (1) the possible deleterious effect upon any of Edinger's personal or business creditors, and (2) Edinger's intentional misleading of the Director during the investigation.

Ultimately, the referee concluded that Edinger had violated Minn. R. Prof. Conduct 8.1(a)(1) and 8.4(c)-(d) by providing false statements to the Director and preparing and submitting fictitious documents to the Director; Minn. R. Prof. Conduct 8.1(a)(3) and Rule 25, Rules on Lawyers Professional Responsibility ("RLPR") by failing to cooperate with the Director's investigation; Minn. R. Prof. Conduct 1.15(a) by using his trust account for personal purposes; and Minn. R. Prof. Conduct 1.15(h) and Lawyers Professional Responsibility Board Opinion No. 9 by failing to maintain the proper trust account books, records, and procedures. The referee recommended that Edinger be suspended from the practice of law for 3 months; be required to comply with Rule 26, RLPR; be assessed costs and disbursements pursuant to Rule 24, RLPR; and be required to comply with the reinstatement requirements of Rule 18(a)-(e), RLPR.

The Director does not challenge the referee's findings or conclusions but disagrees with the referee's recommended discipline and requested this court's review. The Director requests an indefinite suspension for at least 6 months.

■■■■ Although a referee's recommendation for discipline carries great weight, we have final responsibility for determining whether discipline is appropriate and, if so, the type of discipline to be imposed. *In re Jagiela*, 517 N.W.2d 333, 335 (Minn. 1994). While we seek consistency, we also

examine each case individually and impose sanctions based on unique circumstances of each case. *In re Ruffenach,* 486 N.W.2d 387, 390 (Minn.1992). To determine appropriate sanctions, we consider our prior disciplinary decisions, any aggravating or mitigating circumstances, and the following four factors: (1) the nature of the misconduct, (2) the cumulative weight of the disciplinary violations, (3) the harm to the public, and (4) the harm to the legal profession. *In re Moore,* 692 N.W.2d 446, 450 (Minn.2005).

■ The Director asserts that 3 months' suspension is insufficient discipline for Edinger's misconduct. The Director argues that Edinger's conduct warrants an indefinite suspension of at least 6 months, emphasizing the seriousness of Edinger's noncooperation and false statements. The Director relies on our prior disciplinary decisions that involved manufacturing documents to conceal misconduct. *See, e.g., In re Peterson,* 620 N.W.2d 29, 30 (Minn. 2000) (ordering 6 months' suspension for fabricating a homestead waiver); *In re Margolis,* 570 N.W.2d 688, 689–90, 692 (Minn.1997) (ordering 12 months' suspension for forging client's signature on workers' compensation documents, completing a settlement without the client's consent, and fabricating file notes to cover up the misconduct); *In re Zotaley,* 546 N.W.2d 16 (Minn.1996) (ordering 6–month suspension for submitting insurance form from other client's file); and *In re Jagiela,* 517 N.W.2d at 335–36 (ordering 6 months' suspension for backdating an agreement and then producing it in discovery).

Edinger argues that 3 months' suspension is too severe and would work a hardship on him as a solo practitioner and on the public defense system. Edinger asserts that an adequate discipline would be a public reprimand with 2 years' probation. Edinger contends that a public reprimand

is appropriate because this is his first disciplinary proceeding, he is a solo practitioner providing a crucial public service, and he admitted that his conduct was dishonest and fraudulent. Edinger relies on our prior disciplinary decisions that involved the making of false statements in disciplinary investigations. *See, e.g., In re Hoover,* 645 N.W.2d 85, 86 (Minn.2002) (ordering public reprimand and probation for using the client trust account for personal expenses and not cooperating in the disciplinary investigation); *In re Bidjou,* 615 N.W.2d 275, 275 (Minn.2000) (ordering public reprimand for false statements in bar application concerning involvement in prior legal proceedings); *In re Iliff,* 487 N.W.2d 234, 236 (Minn.1992) (ordering 3 months' suspension for client neglect and fraudulent response to an ethics complaint where there had been prior discipline).

■ We recognize that the underlying trust account violations presented no risk of harm to clients and, thus, by themselves, might justify lesser discipline. *See, e.g., In re Erickson,* 506 N.W.2d 628, 629 (Minn.1993) (60–day suspension for trust account violations without intent to profit, as well as mismanagement of private placement adoption). But we are troubled by the pattern of actions that Edinger took to conceal his misuse of the client trust account. It is imperative that a lawyer fully cooperate with the Director's inquiries on trust account overdrafts and timely and truthfully respond to any ensuing disciplinary investigation. Failure to cooperate with the disciplinary process is a serious violation and itself warrants discipline, including suspension. *In re Flatten,* 611 N.W.2d 340, 341, 343 (Minn.2000) (ordering indefinite suspension for complete lack of cooperation in investigation of trust account violations); *In re Grzybek,* 552 N.W.2d 215, 217 (Minn.1996) (ordering a 6 months' suspension, despite absence of di-

rect injury to clients, for attorney's neglect of client matters and noncooperation with the discipline investigation).

The referee carefully weighed all of these factors. Accordingly, we adopt his recommendation and order that effective 20 days from the date of this opinion Richard Edward Edinger be indefinitely suspended from the practice of law, pay $900 in costs and disbursements pursuant to Rule 24, RLPR, and comply fully with Rule 26, RLPR. Edinger may seek reinstatement after 3 months from the date of this opinion, but must comply fully with Rule 18(a)-(e), RLPR.

So ordered.

ANDERSON, PAUL H., Justice (dissenting).

I respectfully dissent. Given the nature and degree of Edinger's misconduct, I conclude that the disciplinary sanction we are imposing is insufficient because it is disproportionate to sanctions we have imposed in other cases. Further, while I am cognizant that Edinger is a solo practitioner and acknowledge the positive benefit that his service as a public defender has for society, I nevertheless disagree with his attempt to use this service as a reason to mitigate the sanction we impose. Given Edinger's misconduct, I deem it inappropriate to look at the nature of his practice as a mitigating factor.

I would increase the length of time after which Edinger may seek reinstatement from three months to four months. For further explanation of the reasons that underlie my conclusion, see my companion dissent in *In re Crandall*, 699 N.W.2d 769 (Minn. July 28, 2005), a case heard on the same day we heard this case, which is being released simultaneously with this opinion.

BLATZ, Chief Justice (dissenting).

I join in the dissent of Justice Paul H. Anderson.

PAGE, Justice (dissenting).

I respectfully dissent. Given Edinger's misconduct, I believe that the disciplinary sanction imposed is insufficient to deter other lawyers from engaging in like misconduct.

BLATZ, Chief Justice (dissenting).

I join in the dissent of Justice Page.