In re Petition for DISCIPLINARY AC-
TION AGAINST Brian J. PETERSON,
a Minnesota Attorney, Registration
No. 85625.

No. A05–646.

Supreme Court of Minnesota.

July 27, 2006.

See also, 658 N.W.2d 875; 660 N.W.2d 419.

## OPINION

### PER CURIAM.

This attorney discipline case arises out of a petition and a supplementary petition filed by the Director of the Office of Lawyers Professional Responsibility (OLPR) against respondent Brian J. Peterson alleging numerous violations of the Minnesota Rules of Professional Conduct. We granted the director's request for temporary suspension based on the alleged misconduct. After a hearing, the referee concluded that Peterson had violated Minn. R. Prof. Conduct 1.7(b), 14 Minn.Stat. 1391–92 (2004) (amended June 17, 2005, eff. Oct. 1, 2005) (conflict of interest), Minn. R. Prof. Conduct 8.4(b) (commission of a criminal act), and Minn. R. Prof. Conduct 8.4(c) (conduct involving dishonesty, fraud, deceit, or misrepresentation). The referee recommended that Peterson be disbarred. We conclude that disbarment is the appropriate discipline.

Peterson was admitted to practice law in Minnesota on October 1, 1976. He has a history of professional discipline. Peterson has been admonished for professional misconduct connected with his representation of six separate clients. He was previously suspended by this court on December 21, 2000. *In re Peterson,* 620 N.W.2d 29, 30 (Minn.2000). That suspension was based on Peterson's misconduct in fabrication of a homestead waiver and in filing an attorney's lien against the client's homestead without obtaining a validly executed waiver of the homestead exemption. *Id.* The director filed another petition for disciplinary action alleging that, while suspended, Peterson filed an attorney's lien against a client's homestead using a fabricated waiver of the homestead exemption. The referee appointed by this court in that matter agreed with the director, and we

affirmed the referee's conclusion that Peterson committed misconduct and that the misconduct warranted suspension. *In re Peterson*, 658 N.W.2d 875, 875 (Minn. 2003). Peterson and the director entered into an agreement stipulating the conditions for Peterson's reinstatement, and we then ordered Peterson's reinstatement to the practice of law with supervised probation for a two-year period. *In re Peterson*, 660 N.W.2d 419, 420 (Minn.2003).

The majority of the allegations contained in the petition and supplementary petition for disciplinary action currently before us arise from Peterson's actions while acting as attorney in fact for his client, Mildred Johnson, an elderly widow. In 1994, Johnson retained Peterson to prepare her will, and in August 2000 Johnson designated Peterson as her attorney in fact. In December of 2002, Johnson fell in her apartment, fracturing her pelvis. As a result of this injury, Johnson was admitted to the Maranatha Care Center (MCC), where she was diagnosed with moderate dementia. At the hearing, Johnson's physician opined that, from the time of Johnson's admission to MCC, Johnson was unable to make decisions regarding her health care or finances and that Johnson would not be able to return to her assisted-living facility.

Soon after Johnson's admission to MCC, Peterson decided to engage in a "spend down"[1] of Johnson's assets in order to make her eligible for government medical assistance. In January of 2003, Peterson estimated that Johnson had roughly $100,000 in assets, an estimate he based on a 1995 inventory of Johnson's property. Because Peterson was suspended from the practice of law at that time, he retained Donald Fraley, an attorney for whom Peterson was currently working as a legal assistant, to "protect [Johnson's] interests."[2]

In connection with the spend down, Peterson made a variety of purchases with Johnson's assets. On January 20, 2003, Peterson purchased a 1998 Nissan Infiniti I30 for $10,018.38. He and Johnson were both listed on the title to the vehicle. Peterson testified that when he purchased the Infiniti he believed that $4,500 was the maximum vehicle exemption for the purposes of a medical assistance application. Soon after he purchased the Infiniti, Peterson testified that he was informed by a Hennepin County employee that there was no maximum vehicle exemption and that "You can buy a $40,000 car as far as we're concerned. There's no limit as long as you use it to do things for her." Peterson further testified that based on this information he wrote a check to Johnson for the purchase price of the Infiniti, removed Johnson's name from the title, and began looking for a more expensive vehicle for Johnson to purchase as part of the "spend down."

Peterson, acting as Johnson's attorney in fact, next purchased a 2003 Acura 3.5RL for $37,350.00. Peterson and Johnson were again both listed on the title, which Peterson testified was done for insurance purposes because Johnson did not have a valid driver's license. Other purchases made on Johnson's behalf as part of the

---

1. Peterson used the term "spend down" to indicate the sheltering of Johnson's assets prior to her application for medical assistance.

2. The OLPR brought a separate petition for disciplinary action against Fraley for his representation of Johnson. Fraley and the director entered into a stipulation under which Fraley agreed to allow the allegations in the petition to be deemed admitted and he and the director jointly recommended a 90–day suspension as the appropriate discipline. We suspended Fraley indefinitely with no possibility of reinstatement for 90 days. *In re Fraley*, 709 N.W.2d 624, 625 (Minn.2006).

spend down included the purchase of Thomas Moser furniture, Seasonal Concepts furniture, sculptures, and a sound system with a subwoofer. In addition, Peterson attempted to establish a pooled trust which he testified was intended to shelter Johnson's remaining assets.

Hennepin County received Peterson's first application for medical assistance, made on behalf of Johnson, on January 31, 2003. While Johnson's application was initially approved, medical assistance benefits were eventually denied on the basis of Johnson's ownership of the Acura. Peterson, through Fraley, appealed this denial, but later dropped the appeal and, on May 13, 2003, purchased the Acura from Johnson for $27,300. Peterson's second application for medical assistance was received by Hennepin County on September 19, 2003. Hennepin County Adult Protection subsequently brought a petition for conservatorship, and a guardian/conservator was appointed for Johnson by early 2005. On January 10, 2005, Peterson was convicted of violating Minn.Stat. § 297B.10(a) (2004) (evasion of sales tax on motor vehicles) in connection with his purchase of the Acura from Johnson.

On March 31, 2005, the director filed the present petition for revocation of probation and further disciplinary action. The director alleged that Peterson had violated Rule 1.7(b), Minn. R. Prof. Conduct 1.5(a) (unreasonable fees), Minn. R. Prof. Conduct 1.8(c) (conflict of interest), Minn. R. Prof. Conduct 3.4(c) (disobey obligation under rules of tribunal), Minn. R. Prof. Conduct 5.5 (unauthorized practice of law), rule 8.4(b), rule 8.4(c), and Minn. R. Prof. Conduct 8.4(d) (conduct prejudicial to the administration of justice). In a supplementary petition, the director also alleged a violation of Minn. R. Prof. Conduct 1.15(a) (safekeeping of client funds) and rule 8.4(c).

After a hearing, the referee concluded that Peterson had violated rules 1.7(b) and 8.4(b) in connection with his purchase of the Acura from Johnson. In addition, the referee concluded that Peterson violated rule 8.4(c) through omissions made in Johnson's two applications for medical assistance. The referee found Peterson's history of professional discipline to be an aggravating factor and recommended that Peterson be disbarred. Peterson appeals to this court, disputing the referee's findings, conclusions, and recommendation. The director argues the referee's recommended discipline is appropriate, but asserts that the referee erred in failing to find that Peterson committed additional acts of misconduct.

I.

■ Peterson ordered a transcript of the referee's hearing. Therefore, under rule 14(e), Rules on Lawyers Professional Responsibility (RLPR), the referee's findings and conclusions of law are not binding on this court. *In re Wentzell,* 656 N.W.2d 402, 405 (Minn.2003). Generally, "this court will not reverse the findings and conclusions of the referee in a disciplinary hearing unless they are clearly erroneous." *In re Reiter,* 567 N.W.2d 699, 701 (Minn. 1997). We must be " 'left with the definite and firm conviction that a mistake has been made' " before determining a referee's findings to be clearly erroneous. *Wentzell,* 656 N.W.2d at 405 (quoting *In re Strid,* 551 N.W.2d 212, 215 (Minn.1996)).

A.

■ Peterson's first challenge is to the referee's conclusion that Peterson's May 2003 purchase of the Acura from Johnson

violated rule 1.7(b).[3] The referee based this legal conclusion on his finding that Peterson purchased the Acura "for his personal use for less than fair market value." This finding was based in large part on the testimony of Richard Hibbing, a used car sales manager at Buerkle Acura. Hibbing, whose testimony the referee found credible, testified that the Acura in question would have had a retail sale value of at least $34,000 in May of 2003. Hibbing further testified that the Acura's value in a private sale would have been $32,000 to $33,000 and that the auction or trade-in value would be $31,000 to $32,000. Hibbing concluded that a person who paid $27,300 for the Acura in question in May of 2003, as did Peterson, paid less than fair market value for the vehicle and stated "we call it stealing a car in the car business."

■ Before this court, Peterson challenges the referee's conclusion by arguing that there is no evidence to show that he had reason to believe that the $27,300 he paid for the Acura was not a fair price. Peterson arrived at the sale price after obtaining trade-in offers from two car dealerships. Peterson stated that he "presumed that the offers [he] got were [the dealers'] best offers" and that he asked the dealers "what's the most you can allow me on this vehicle, assuming a trade on a new [Acura] MDX." Peterson also argues that he believed he was paying a fair price based on his compliance with the request of Richard Newstrom, a Hennepin County employee involved with applications for medical assistance, who requested that Peterson submit a written estimate of value from a dealer to Hennepin County before purchasing Johnson's Acura. The director argues that Peterson's intent to pay less than a fair price for Johnson's Acura can be inferred from the circumstances.

It is evident from the circumstances of Peterson's purchase of Johnson's Acura that Peterson knew or should have known that he was paying less than fair market value for the Acura. Peterson testified that he had purchased Acura vehicles in the past and, when obtaining estimates on the value of the Acura, he presented the car as a potential trade-in to dealerships. Because Peterson knew or should have known that he was paying less than fair market value, Peterson cannot have reasonably believed that his representation of Johnson in connection with his purchase of Johnson's Acura would not be adversely affected by his own financial interests. Consequently, the referee did not clearly err in concluding that Peterson violated rule 1.7(b).

### B.

■ The referee concluded that Peterson violated rule 8.4(b)[4] when he failed to pay motor vehicle tax on his purchase of Johnson's Acura for himself. This conclusion was based on Peterson's conviction

---

3. This rule provides, in relevant part:
 (b) A lawyer shall not represent a client if the representation of that client may be materially limited * * * by the lawyer's own interest, unless:
 (1) the lawyer reasonably believes the representation will not be adversely affected; and
 (2) the client consents after consultation.
 Minn. R. Prof. Conduct 1.7(b), 14 Minn.Stat. 1391–92 (2004) (amended June 17, 2005, eff. Oct. 1, 2005).

4. It is professional misconduct for a lawyer to:
 * * * *
 (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects.
 Minn. R. Prof. Conduct 8.4(b).

under Minn.Stat. § 297B.10(a). Since the district court found Peterson guilty pursuant to this statute, the court necessarily found that Peterson acted "with intent to defeat or evade the tax." Minn.Stat. § 297B.10(a). As Peterson acknowledges, in disciplinary proceedings "[a] lawyer's criminal conviction in any American jurisdiction * * * [is] conclusive evidence that the lawyer committed the conduct for which the lawyer was convicted." Rule 19(a), RLPR. Despite this, Peterson continues to argue that he did not know that his purchase of the Acura from Johnson was a taxable transaction, and he implies that the circumstances surrounding his conviction demonstrate that he did not violate rule 8.4(b). Peterson's knowledge that the transaction was taxable is an implicit element of a section 297B.10(a) violation, and "attorneys may not avoid the consequences of criminal conviction by attempting to relitigate the issue of guilt or innocence in subsequent disciplinary proceedings." *In re Dvorak,* 554 N.W.2d 399, 402 (Minn.1996). Because Peterson was convicted of intentional evasion of a tax, the referee did not clearly err in concluding that Peterson committed a criminal act which reflects adversely on Peterson's "honesty, trustworthiness, or fitness as a lawyer in other respects." Rule 8.4(b).

### C.

Peterson's remaining challenges to the findings and conclusions of the referee concern the referee's conclusion that Peterson violated rule 8.4(c)[5] through omissions he made on Johnson's applications for medical assistance. Peterson admits that he did not disclose all of Johnson's existing assets on either application, but, with regard to each of the omitted assets, he maintains that: (1) the medical assistance application did not inquire about the asset, (2) he believed he did not need to disclose the asset, or (3) he was unaware of the existence of the asset. Consequently, Peterson argues that it was clearly erroneous for the referee to conclude such nondisclosure was "conduct involving dishonesty, fraud, deceit or misrepresentation" in violation of rule 8.4(c). The director argues that the referee's findings and conclusion on this subject are well supported by the record and far from clearly erroneous.

The first medical assistance application submitted by Peterson was received by the county on January 31, 2003, and the date January 28, 2003, appears next to Peterson's signature. The application, which requested assistance beginning on February 1, 2003, disclosed the existence of the following assets: (1) a U.S. Bank checking account, (2) an annuity, (3) a pension, (4) Social Security payments, and (5) an "auto." The referee found that Peterson did not disclose the following assets on the application: (1) the 1998 Nissan Infiniti, (2) the 2003 Acura, (3) the Pooled Trust Agreement, (4) a Twin Cities Federal (TCF) account, (5) an "IDS account," (6) an American Enterprise annuity, and (7) "the balance of the approximately $108,000 in assets known by [Peterson] to be in existence at the time of the Medical Assistance application." Peterson does not appear to dispute that these assets were not disclosed, but instead argues that the referee clearly erred in concluding such omissions formed a basis for a violation of rule 8.4(c).

■ While the propriety of some of these omissions may be open to dispute, the referee's conclusion that Peterson vio-

---

**5.** It is professional misconduct for a lawyer to:

* * * *

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation.

Minn. R. Prof. Conduct 8.4(c).

lated rule 8.4(c) when he submitted the first application for medical assistance is not clearly erroneous. We base this conclusion on Peterson's omission of the American Enterprise annuity on the application. The medical assistance application clearly asks applicants to list all annuities owned by the applicant. Peterson's testimony indicates that he received and read Johnson's January statement for her TCF checking account. On this statement was an automated deposit of $409.04 described as "Am Enterprise[,] Ann Payout." Peterson testified that he thought "Ann Payout" meant "annual payment"; this apparently was his explanation for his nondisclosure of the American Enterprise annuity on the application. The referee did not find this explanation credible. Given Peterson's knowledge of the TCF statement at the time of the first application, and given that the referee did not credit Peterson's explanation, the referee did not clearly err in concluding that nondisclosure of this annuity constituted conduct involving "dishonesty, fraud, deceit or misrepresentation." Rule 8.4(c).

The second medical assistance application submitted by Peterson was received by Hennepin County on September 19, 2003, and the date August 22, 2003, appears next to Peterson's signature. With the exception that an "auto" was no longer listed as one of Johnson's assets, the second application disclosed the same assets as those disclosed on the first application. The referee found that Peterson did not disclose the following assets on the second application: (1) the pooled trust, (2) the furniture and art work purchased by Peterson with Johnson's funds, and (3) the full balance of Johnson's U.S. Bank account. With the exception of the balance

of the U.S. Bank account, Peterson does not contest that he failed to disclose these assets. He does, however, contest the referee's conclusion that such nondisclosure constitutes a violation of rule 8.4(c).

■ Based on Peterson's failure to disclose the pooled trust, the referee did not clearly err in concluding that Peterson violated rule 8.4(c) when he submitted the second application. On January 30, 2003, Peterson, acting on behalf of Johnson, signed a "pooled trust agreement" which attempted to establish an irrevocable trust with Johnson as its beneficiary. Both Peterson's and the director's expert witnesses testified that the agreement did not create an effective pooled trust. Between the time of Peterson's first and second applications for medical assistance, Peterson appears to have made substantial transfers of money in and out of the trust.[6] The referee found that the pooled trust had a balance of $20,640.59 on September 2, 2003, and neither the director nor Peterson challenges this finding as erroneous.

Peterson admits he never disclosed this trust on his applications for medical assistance, but maintains that he believed he did not have to disclose this trust because it was an exempt asset. He further argues that the referee credited this belief. A careful reading of the referee's findings, however, indicates that the referee *did not* find this belief credible. In his findings, the referee stated that:

> [Peterson] believed he did not have to disclose the existence of the Pooled Trust account on the first or second medical assistance application from information he received from reading the State Medical Manual. [Peterson] re-

6. The exact amount in the pooled trust is somewhat difficult to determine because the trust was maintained as part of Fraley's client trust account and apparently no distinction was made between funds held by Fraley connected with his legal representation of Johnson and funds held pursuant to the "pooled trust agreement."

viewed the State Medical Manual and believed from this manual that he did not have to list any exempt assets as assets in any of the Medical Assistance Application [sic]. * * * It was [Peterson's] belief that the Pooled Trust was an excludable asset when applying for Medical Assistance.

* * * *

The evidence demonstrates that [Peterson] had knowledge of a substantial amount of assets that he did not disclose on the second Medical Assistance Application. Further, the Referee *does not find credible [Peterson's] explanation that he did not believe he was legally obligated to disclose such assets because they are exempt.*

(Emphasis added.) Reading the relevant findings together, it becomes apparent that the referee did not credit Peterson's testimony concerning his belief that he did not have to disclose exempt assets, including the pooled trust. Beyond citations of CLE materials and provisions of the State Medicaid Manual that do not directly deal with disclosure, referenced in Peterson's affidavit, this "belief" was the only evidence Peterson offered as a basis for his nondisclosure of the trust. Peterson's own expert witness, along with the expert witness for the director, testified that such a trust must be disclosed, and the medical assistance application form specifically asks if the applicant owns any trusts and if any transfers of the applicant's assets have been made to a trust in the past five years. In light of this evidence that disclosure of

the trust was required and given the referee's finding that Peterson's explanation for his nondisclosure of exempt assets—including the trust—was not credible, the referee did not clearly err in concluding that Peterson engaged in "conduct involving dishonesty, fraud, deceit or misrepresentation" when he submitted the second application.

## II.

While the director argues that the referee's findings of misconduct offer a more than sufficient basis for the recommended disbarment of Peterson, the director also argues that the referee clearly erred in failing to find three additional instances of misconduct. Peterson argues that he acted properly throughout the events underlying these instances of alleged misconduct.

## A.

The director first challenges the referee's conclusion that "[t]he Director has failed to prove by clear and convincing evidence * * * [that Peterson] violated Minnesota Rule of Professional Conduct 1.15(a)." The director argues that Peterson's handling of Johnson's funds violated rule 1.15(a)[7] on two occasions, and that such violations also breached rule 8.4(c).

### 1. Misappropriation of $26,365 in May 2003.

■ According to Moser's billing records, after Peterson paid an initial deposit of $32,760, Peterson's outstanding balance

---

7. The text of the rule is as follows:

(a) All funds of clients or third persons held by a lawyer or law firm in connection with a representation shall be deposited in one or more identifiable interest-bearing trust accounts as set forth in paragraphs (d) through (g). No funds belonging to the lawyer or law firm shall be deposited therein except as follows:

(1) funds of the lawyer or law firm reasonably sufficient to pay service charges may be deposited therein;

(2) funds belonging in part to a client or third person and in part presently or potentially to the lawyer or law firm must be deposited therein.

Minn. R. Prof. Conduct 1.15(a).

for the Moser furniture ordered on Johnson's behalf was $38,400. On May 13, 2003, Peterson wrote check number 1036 in the amount of $38,365 from one of Johnson's bank accounts to the account of Peterson's family partnership. On the memo line of that check Peterson wrote "Furniture repay (charged on Visa)." As of May 13, 2003, Peterson had charged $12,000 of the outstanding Moser bill on his personal credit card. Peterson testified that he thought Moser was going to charge him for the entire outstanding balance in one transaction, and that he only discovered later that only $12,000 could be charged to his credit card in one transaction. The referee appears to have credited this testimony. The referee found that Peterson eventually spent the remaining funds on artwork purchased as part of the "spend down." The director argues that Peterson only had a claim or entitlement to $12,000 at the time he wrote check number 1036, and therefore misappropriated $26,365.

 The referee's conclusion that the director had failed to prove by clear and convincing evidence that Peterson violated rule 1.15(a) is clearly erroneous in light of the referee's factual findings. While the referee found that Peterson eventually spent the entire $38,365 on behalf of Johnson, the artwork purchased on Johnson's behalf was not purchased until after the balance of the Moser furniture order was cancelled in September 2003. This leaves several months during which Peterson

held, without entitlement, $26,365 of Johnson's money in a personal account. This constitutes a violation of rule 1.15(a).[8]

### 2. Misappropriation of $6,275 in September 2003.

 After the balance of the Moser furniture order was canceled at the request of Peterson's wife, Peterson received a refund check from Moser in the amount of $6,275. Peterson deposited this money into one of his personal accounts. Peterson testified that he deposited such money to cover storage costs of Johnson's property, but he admitted that at the time of the deposit of the refund, Johnson only owed him half of the check's amount. According to Peterson, the remainder of the check constituted prepayment of "future storage costs." The director argues that the referee clearly erred in not concluding that this prepayment of storage fees violated rule 1.15(a). Since Peterson, by his own testimony, admitted that he placed Johnson's money in his personal account before he had a claim of right to it, the referee clearly erred in not concluding that Peterson's retention of the entire refund check violated rule 1.15(a).[9]

### B.

 In the petition for revocation of probation and further disciplinary action, the director alleged that Peterson violated rules 8.4(b)-(c) through his purchase of the 1998 Infiniti from Johnson. The alleged

---

8. Peterson testified at the hearing that he paid approximately $33,000 to his credit card company in June 2003 toward what he believed were the outstanding furniture charges. The referee did not make any finding directly related to this testimony. But, even assuming this testimony is true, Peterson continued to hold a balance of approximately $5,000 of the $38,625 check in a personal account after he made the "furniture payments" to his credit card company. In the absence of any evidence of entitlement to the balance of the

check, Peterson's retention of the $5,000 (even if later spent on artwork purchased as part of the spend down) constitutes a violation of rule 1.15(a).

9. Given our standard of deference to the referee, we decline to hold that the referee clearly erred by not concluding that the two incidents of misappropriation also constituted violations of rule 8.4(c).

violation was based on Peterson's failure to report the transaction as a sale and his consequent failure to pay state sales tax. While the referee found that Peterson did not engage in self-dealing when he purchased the Infiniti from Johnson, the referee made no conclusion concerning whether the transaction violated Rules 8.4(b)-(c). The director argues that the referee's failure to find that the purchase of the Infiniti from Johnson violated rules 8.4(b)-(c) was clearly erroneous.

To violate rule 8.4(b), the Infiniti purchase must constitute a criminal act reflecting adversely on Peterson's fitness as a lawyer; to violate rule 8.4(c), the transaction must entail conduct that involved dishonesty, fraud, deceit, or misrepresentation. When Peterson initially purchased the Infiniti, he and Johnson were both listed on the vehicle's title (an action that Peterson testified was taken for insurance purposes). Despite the presence of his name on the title, Peterson testified that Johnson was the owner of the vehicle. In the transaction at issue, Peterson paid Johnson for the Infiniti and then removed Johnson's name from the title. Peterson does not argue that this is not a taxable transaction, and there is no evidence that Peterson paid any sales tax to the state when he purchased the Infiniti from Johnson. But Peterson maintains that he did not know this transaction was taxable and that he sought and acted according to advice obtained from an employee of the Department of Motor Vehicles.

The director argues that because the referee failed to credit this explanation in regard to Peterson's failure to pay tax when he purchased the *Acura* from Johnson, we should assume the referee did not credit this explanation for Peterson's failure to pay sales tax on the Infiniti. But, as Peterson notes, there are differences between the two transactions which could lead the referee to credit Peterson's testimony concerning the transfer of the title of the Infiniti from Johnson to Peterson. For example, when Peterson purchased the Infiniti, his name was on the title both before and after the purchase. When Peterson purchased the Acura from Johnson, his name was removed and the title was transferred to a Peterson family partnership. In addition, it appears that no "Affidavit to Correct the Ownership Record of a Motor Vehicle" was submitted when Peterson purchased the Infiniti while such an affidavit was submitted when he purchased the Acura. These differences could impact the referee's determination regarding whether, when purchasing the Infiniti, Peterson acted dishonestly or in a criminal manner that reflected adversely on his fitness to practice. Given that "we give great deference to a referee's findings * * * especially in cases where the referee's findings rest on disputed testimony or in part on respondent's credibility, demeanor, or sincerity," *Wentzell,* 656 N.W.2d at 405, the referee did not clearly err in failing to find that Peterson violated rules 8.4(b)-(c) by failing to pay sales tax when purchasing Johnson's Infiniti.

### III.

The final issue before us is what discipline is appropriate in this case. While a referee's recommendation for discipline carries great weight, we have final responsibility for determining the appropriate discipline. *In re Edinger,* 700 N.W.2d 462, 467 (Minn.2005).

After finding Peterson's disciplinary history to be an aggravating factor, the referee recommended that Peterson be disbarred. The director agrees that disbarment is warranted. Peterson, who argues that his only act of misconduct was being convicted of tax evasion in connec-

tion with the Acura purchase, requests reinstatement to the practice of law.

██ "Disciplinary sanctions for professional misconduct are imposed to protect the public and the judicial system, and to deter future misconduct." *In re Crandall,* 699 N.W.2d 769, 771 (Minn.2005). In determining the appropriate sanction for attorney misconduct, we consider four factors: " '1) the nature of the misconduct, 2) the cumulative weight of the violations of the rules of professional conduct, 3) the harm to the public, and 4) the harm to the legal profession.' " *In re Oberhauser,* 679 N.W.2d 153, 159 (Minn.2004) (quoting *In re Singer,* 541 N.W.2d 313, 316 (Minn. 1996)). While we look to similar cases for guidance, sanctions are determined on a case-by-case basis after examining the acts of misconduct and considering both aggravating and mitigating circumstances. *Wentzell,* 656 N.W.2d at 408.

Peterson points to *Dvorak* as a similar case to which we should look when determining the appropriate discipline. In *Dvorak,* the attorney received a public reprimand as a sanction for the attorney's guilty plea to the misdemeanor of filing a false tax return. 554 N.W.2d at 401, 403–04. When determining the appropriate discipline, we stated that we would "look to the circumstances surrounding a criminal conviction to see whether a lesser disciplinary sanction is appropriate." *Id.* at 404. In examining the circumstances surrounding Dvorak's conviction, we noted that there appeared to be selective prosecution of Dvorak and that the prosecution accepted her plea to a misdemeanor because of difficulties in proving "outright fraud." *Id.* Peterson appears to analogize his conviction for evasion of sales tax to Dvorak's conviction—he maintains his innocence and argues that he only agreed to submit the case on stipulated facts to avoid prosecution of his wife. But *Dvorak* is easily distinguished from this case because it involved a conviction occurring in another state and authorities in that state had already determined that no suspension was warranted as a consequence. 554 N.W.2d at 403–04 (noting that "[w]here an attorney has been sanctioned by disciplinary authorities in his or her home state for misconduct occurring in that state, we look first to that state's determination of the appropriate sanction").

██ We consider the severity of Peterson's misconduct and the aggravating factor of his prior disciplinary history when determining the appropriate discipline. In this case, Peterson committed the following acts of misconduct: (1) engaging in self-dealing when purchasing a client's property, (2) intentional evasion of state sales tax, (3) making dishonest omissions on two applications for medical assistance, and (4) misappropriation of client funds on two occasions. Peterson has been admonished for professional misconduct connected with his representation of at least six separate clients, and we have determined on two prior occasions that Peterson's misconduct warranted suspension. We conclude that the appropriate discipline in this case is disbarment. Therefore, we order that Brian J. Peterson be, and hereby is, disbarred.

GILDEA, J., took no part in the consideration or decision of this case.