**In re Petition for DISCIPLINARY ACTION AGAINST Michael Laurence CZARNIK, a Minnesota Attorney, Registration No. 257382.**

No. A07–1885.

Supreme Court of Minnesota.

Jan. 15, 2009.

Martin A. Cole, Director, Patrick R. Burns, First Assistant Director, Office of Lawyers Professional Responsibility, St. Paul, MN, for petitioner.

Jonathan K. Reppe, Northfield, MN, for respondent attorney.

## OPINION

PER CURIAM.

On August 28, 2007, the Office of Lawyers Professional Responsibility filed a petition charging respondent Michael Laurence Czarnik with one count of professional misconduct. The petition alleged that Czarnik gave false testimony under oath, in violation of Rules 8.4(c) and (d) of the Minnesota Rules of Professional Conduct. Czarnik answered the petition, and after a hearing, the referee recommended that Czarnik be suspended indefinitely with eligibility to apply for reinstatement after 6 months. We conclude that Czarnik violated Rules 8.4(c) and (d) of the Minnesota Rules of Professional Conduct, and that the appropriate discipline is a 90–day suspension, a requirement that Czarnik take and pass the professional responsibility portion of the state bar examination, and unsupervised probation.

Czarnik was admitted to practice law in Minnesota in 1995. Between January 2001 and July 2005, Czarnik worked for Minnesota Housing Resources, Inc. (MHR), a Minnesota corporation that administers contracts for the rehabilitation of low-income housing. Czarnik served as MHR's employee, legal services contractor, and Chief Financial Officer. Czarnik was also a shareholder in MHR during the same period. In his capacity as Chief Financial Officer, Czarnik was responsible for most of the human resources and financial issues at MHR. While employed at MHR, Czarnik worked with a tax preparer, gathering information eventually used in his 2004 tax return and MHR's 2004 tax return.

Czarnik began working for Dream Home Development (DHD) in February 2004. While working for DHD, Czarnik continued working for MHR as Chief Financial Officer. Czarnik also continued to provide MHR with legal services on a contract basis.

Czarnik left DHD in January 2005. After leaving DHD, Czarnik and other former DHD employees sued DHD seeking

past wages and reimbursement for expenses.

On March 10, 2005, Czarnik's deposition was taken under oath in *Michael Czarnik, et al. v. Dream Home Development, et al.* In that deposition, Czarnik gave the following testimony:

Q. From January of 2004 to January of 2005 did you have any sources of income other than Dream Home Development?

A. Define sources of income.

Q. Did you receive any monies from any other—from anywhere?

A. Stocks, bonds?

Q. Sure, stocks, bonds?

A. Yes.

Q. So with the exception of publicly traded stocks and your bonds did you ever receive any sources of income from anything else?

A. No.

. . .

Q. Did you ever receive any distributions from Minnesota Housing Resources in '04?

A. No.

Q. Receive any income from them at all?

A. No.

Q. In '03 did you receive any?

A. I shouldn't say—I'll go back. Before I did receive salary from Minnesota Housing Resources, before I moved to Dream Home, before I actually became an employee of Dream Home.

Q. Did Minnesota Housing Resources ever pay any of your expenses?

A. No.

Q. Did you ever receive any payments from them whatsoever?

A. No. In the context again after I became employed at Dream Home Development.

. . .

Q. As the CFO of the Minnesota Housing Resources you reviewed their budget, reviewed their expenditures, correct?

A. Correct.

Q. Do you know if there were any monies for legal fees paid in the year 2004?

A. I don't remember. I don't believe there—in 2004?

Q. Yes.

A. In 2004 there were expenses for legal.

Q. For who?

A. I think for Bethel & Associates.

Contrary to this testimony, according to Czarnik's 2004 income tax return, MHR paid Czarnik $20,000 in wages in 2004. Czarnik's 2004 tax return also indicated that Czarnik earned $23,172 from a legal consulting business. Czarnik testified at the disciplinary hearing that $10,500 of the amount for legal consulting represented payments made to Czarnik by MHR in 2004 for legal services. Czarnik could not recall the source of the remaining $12,672 reflected on his tax return.

Czarnik admitted at the disciplinary hearing that he received the $20,000 in wages from MHR in 2004. Czarnik testified that MHR paid Czarnik $20,000 to cover back due wages owed to him. Czarnik also testified at the disciplinary hearing that he was significantly involved in helping MHR acquire property and a mortgage on this property. The money from this mortgage loan was used in part to pay Czarnik's $20,000 in wages, according to Czarnik's testimony at the disciplinary hearing.

At the disciplinary hearing, the Director of the Office of Lawyers Professional Responsibility introduced evidence of six checks issued to Czarnik between April and October 2004, after Czarnik joined DHD in February of that year. Each check was signed by Czarnik on behalf of MHR. The six checks totaled $10,500. Czarnik testified at the disciplinary hearing that he spent over 70 hours providing legal services to MHR in 2004, and kept time records reflecting his services. Czarnik testified that he prepared invoices for his legal work based upon his time records and work product. He submitted each invoice to MHR and signed each of the six checks to himself on behalf of MHR.

In light of these facts, which Czarnik does not dispute, the referee found that

Because of the nature and extent of respondent's involvement in the financial affairs of MHR; the amount of money paid to respondent by MHR in 2004, both as wages and as contract payments for legal services rendered; the number of payments made to respondent in 2004 by MHR; respondent's significant involvement in the MHR transactions that made it possible for him to be paid $20,000 in back due wages; the fact that respondent separately invoiced MHR for each of the six contractor payments he received; that respondent signed the checks from MHR to himself; that respondent, shortly before his March 10 deposition, participated in gathering and providing to a tax preparer information used in preparing both his and MHR's 2004 income tax returns; and the relatively close proximity in time between the payments made to respondent by MHR and his deposition testimony, *it is not credible or likely that respondent was unaware of the payments that had been made to him by MHR at the time of his March 10, 2005, deposition.* Further, the questions asked of respondent

clearly called for disclosure of the payments he received from MHR.

(Emphasis added.)

Czarnik testified that at the time of his deposition, he did not remember receiving payments from MHR in 2004. Czarnik further testified that he did not review any documents relevant to his 2004 income prior to his deposition.

I.

Czarnik contends that his conduct did not violate Rules 8.4(c) and (d) of the Minnesota Rules of Professional Conduct. We disagree.

At a disciplinary hearing, the Director bears the burden of proving by clear and convincing evidence that the attorney violated the Rules of Professional Conduct. *In re Westby,* 639 N.W.2d 358, 367 (Minn.2002). Because a transcript was ordered, the referee's findings of fact and conclusions of law are not binding on this court. *In re Peterson,* 718 N.W.2d 849, 853 (Minn.2006); Rule 14(e), Rules on Lawyers Professional Responsibility (RLPR). We nonetheless give "great deference" to the referee's findings, *In re Wentzell,* 656 N.W.2d 402, 405 (Minn.2003), and will uphold a referee's findings and conclusions "if they have evidentiary support in the record and are not clearly erroneous." *In re Moulton,* 721 N.W.2d 900, 905 (Minn.2006), *amended by In re Moulton,* 733 N.W.2d 777 (Minn.2007). Findings that are based on an attorney's "demeanor, credibility, or sincerity," are particularly entitled to deference. *Id.* Findings of fact will be reversed only if "upon review of the entire evidence, we are left with the definite and firm conviction that a mistake has been made." *Id.* (quoting *In re Pinotti,* 585 N.W.2d 55, 62 (Minn.1998)).

Every attorney admitted to practice law in Minnesota must take the following oath:

You do swear that you will support the Constitution of the United States and that of the state of Minnesota, and will conduct yourself as an attorney and counselor at law in an upright and courteous manner, *to the best of your learning and ability, with all good fidelity as well to the court as to the client,* and that *you will use no falsehood or deceit,* nor delay any person's cause for lucre or malice. So help you God.

Minn.Stat. § 358.07 (2008) (emphasis added). Building on the attorney oath, Minnesota Rules of Professional Conduct 8.4(c) and (d) provide that "[i]t is professional misconduct for a lawyer to: (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; [or] (d) engage in conduct that is prejudicial to the administration of justice."

■ Czarnik does not dispute that his repeated statements—that he did not receive payments from MHR in 2004—were false and made under oath. Czarnik does argue, however, that he did not knowingly lie, but rather did not recall at the time of his deposition receiving compensation from MHR in 2004. There is, however, ample evidence in the record to support the referee's finding that Czarnik was aware of the payments, and still chose to testify falsely. Czarnik was intimately involved in running MHR's financial affairs during his tenure at MHR. With respect to the $10,500 in legal fees Czarnik received from MHR in 2004, Czarnik himself signed, on behalf of MHR, six checks made out to himself. We cannot say that the referee's finding that Czarnik knowingly lied in his deposition was without evidentiary support and clearly erroneous. *See In re Moulton,* 721 N.W.2d at 905.

■ Next, Czarnik argues that even if the referee's factual findings are accepted

as true, he did not violate Rule 8.4(c) because any false representations were not made with an intent to deceive. We reject this argument as well.

We stated in *In re Westby,* 639 N.W.2d at 370, and *In re Peterson,* 456 N.W.2d 89, 92 (Minn.1990), that false representations made with an intent to deceive violate Rule 8.4(c). Based on this precedent, Czarnik argues that intent to deceive is an element of a violation of Rule 8.4(c). Assuming without deciding that an "intent to deceive" is, as Czarnik suggests, an element of a Rule 8.4(c) violation, the evidence presented by the Director is sufficient to support a finding that Czarnik intended to deceive the attorney taking Czarnik's deposition.

In the context of proving fraud, we have held that "a representation is made with fraudulent intent when it is known to be false...." *Florenzano v. Olson,* 387 N.W.2d 168, 173 (Minn.1986). Further, we have stated that "[f]raudulent intent is, in essence, dishonesty or bad faith. What the misrepresenter knows or believes is the key to proof of intent." *Id.* "There is no doubt of fraudulent intent when the misrepresenter knows or believes the matter is not as he or she represents it to be." *Id.* Discussing the relationship between a speaker's knowledge of his statement's falsity and the speaker's intent to deceive, we have held that

intent to deceive ... may be maintained by proof of a false statement, made as of the party's own knowledge, if the thing stated is not merely a matter of opinion, estimate, or judgment, but is susceptible of actual knowledge. In such a case it is not necessary to make proof of an actual intent to deceive.

*Saupe v. St. Paul Trust Co.,* 170 Minn. 366, 369, 212 N.W. 892, 893 (1927) (citing

*Helvetia Copper Co. v. Hart–Parr Co.*, 137 Minn. 321, 324, 163 N.W. 665, 667 (1917)).

Here, the referee found that Czarnik made false statements with knowledge of their falsity. Rule 8.4(c) requires nothing beyond these findings to demonstrate that Czarnik acted with intent to deceive.

■ Next, Czarnik contends that he did not violate Rule 8.4(d) because his conduct was not material to the underlying lawsuit in which Czarnik's deposition was being taken. But Rule 8.4(d), which states that it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice," does not contain a materiality element. Further, Czarnik's obligation to answer questions truthfully does not depend on the materiality of the questions' subject matter. We have stated that "[o]ne of the main purposes of [the discovery rules] is the discovery of facts which will enable litigants to prepare for trial free from the element of surprise. . . ." *Gebhard v. Niedzwiecki*, 265 Minn. 471, 476, 122 N.W.2d 110, 114 (1963). By failing to answer truthfully in his deposition, Czarnik subverted the discovery procedures and engaged in conduct prejudicial to the administration of justice.

## II.

■ The referee recommended that Czarnik be indefinitely suspended from the practice of law with eligibility to apply for reinstatement after 6 months. Czarnik asks this court to impose a private admonition.

■ Although this court places great weight on the recommendation of the referee, we retain the final responsibility for determining the appropriate sanction. *In re Wood*, 716 N.W.2d 341, 347 (Minn. 2006). The purposes of disciplinary sanctions for professional misconduct are to protect the public, to protect the judicial system, and to deter future misconduct by the disciplined attorney as well as by other attorneys. *In re De Rycke*, 707 N.W.2d 370, 373 (Minn.2006). In imposing discipline, we look to the nature of the misconduct, the cumulative weight of the violations, the potential harm caused to the public, and the harm caused to the legal profession. *In re Westby*, 639 N.W.2d 358, 370 (Minn.2002). In that evaluation, three specific considerations come into play: (1) the conduct at issue; (2) the presence of any aggravating factors; and (3) the presence of any mitigating factors. *In re Wentzell*, 656 N.W.2d 402, 408 (Minn.2003). Although discipline is imposed on a case-by-case basis, prior analogous cases may also indicate the proper sanction. *Id.*

Our review of prior analogous cases leads us to conclude that a 90–day suspension is appropriate under these facts. *See In re Johnson*, 744 N.W.2d 18 (Minn.2008) (attorney suspended for 60 days based on respondent's false statements, made in a letter to a district court and in the course of disciplinary proceedings); *In re Block*, 739 N.W.2d 917 (Minn.2007) (imposing a 60–day suspension on an attorney who altered client documents and produced them to opposing counsel without disclosing the alterations, in violation of Minn. R. Prof. Conduct 3.4(b) and (c) and 8.4(c) and (d)); *In re Van Liew*, 712 N.W.2d 758 (Minn. 2006) (imposing a 90–day suspension, subject to conditions, on an attorney who made false statements to a tribunal and failed to file opposition to a motion on behalf of a client, in violation of Minn. R. Prof. Conduct 3.3(a)(1), 4.1, and 8.4(c), and (d)); *In re Scott*, 657 N.W.2d 567 (Minn. 2003) (holding that attorney's conduct of making false statements of fact to court in his own marital dissolution and custody matter warranted 30–day suspension from practice of law, subject to conditions, and payment of $900 in costs).

The Director counsels us to consider our decisions in *In re Ward*, 563 N.W.2d 70 (Minn.1997), and *In re Salmen*, 484 N.W.2d 253 (Minn.1992), in determining whether the recommended sanction is appropriate. In *Ward*, we imposed a 6–month suspension, with no requirement to petition for reinstatement, on an attorney who gave false testimony under oath, presented false testimony of his client, and represented his client despite an impermissible conflict of interest. *Ward*, 563 N.W.2d at 70–72. In *Salmen*, we imposed an indefinite sentence of at least 1 year on an attorney who, in a divorce proceeding, intentionally submitted to the court a letter falsely claiming that Salmen's client owed Salmen $83,750 from a prior debt. *Salmen*, 484 N.W.2d at 253–54.

Czarnik's conduct here does not rise to the level of misconduct at issue in *Ward* and *Salmen*. However, we emphasize offering false testimony under oath is a serious offense. It is particularly serious when the violation is committed by an attorney whose oath requires him or her not only to exhibit personal honesty but also to uphold the integrity of the judicial system. Both of these obligations are compromised by respondent's conduct here.

Accordingly, we order that:

1. Respondent Michael Laurence Czarnik is suspended from the practice of law in the State of Minnesota for 90 days, commencing 14 days from the date of this decision;

2. Czarnik shall comply with the requirements of Rule 26, RLPR;

3. Czarnik shall pay the Director $900 in costs, plus disbursements, pursuant to Rule 24, RLPR;

4. Czarnik may apply for reinstatement by affidavit, pursuant to Rule 18(f), RLPR;

5. Czarnik shall take and pass the professional responsibility portion of the state bar examination within one year of the date of this decision. Within one year from the date of this decision, Czarnik shall file with the Clerk of Appellate Courts and serve upon the Director of the Office of Lawyers Professional Responsibility proof of successful completion of the professional responsibility portion of the state bar examination. Failure to do so shall result in automatic re-suspension, pending successful completion of the examination, pursuant to Rule 18(e)(3), RLPR.

6. Once reinstated, Czarnik shall be placed on unsupervised probation for a period of 2 years. While on unsupervised probation, Czarnik shall comply with the Minnesota Rules of Professional Conduct and shall cooperate with the Director's investigation of any allegations of unprofessional conduct that may come to the Director's attention.

It is so ordered.