STATE OF MINNESOTA

IN SUPREME COURT

A14-1871

Original Jurisdiction

Per Curiam
Concurring in part, dissenting in part, Stras, J.

Inquiry into the Conduct of the
Honorable Alan F. Pendleton

Filed: October 14, 2015
Office of Appellate Courts

_____

William J. Egan, Aaron Mills Scott, Laura E. Stecker, Oppenheimer Wolff & Donnelly LLP, Minneapolis, Minnesota, for the Board on Judicial Standards.

Douglas A. Kelley, Steven E. Wolter, Kelley, Wolter, and Scott, P.A., Minneapolis, Minnesota, for the Honorable Alan F. Pendleton.

_____

S Y L L A B U S

Removal from office is warranted for a judge who violated the Minnesota Constitution and the Code of Judicial Conduct by failing to reside within his judicial district during his continuance in office and who violated the Code of Judicial Conduct by making a knowingly false statement regarding his residency in an affidavit of candidacy for judicial office.

O P I N I O N

PER CURIAM.

This proceeding arises from a formal complaint filed by the Minnesota Board on Judicial Standards (the Board) against the Honorable Alan F. Pendleton, Judge of the

1

District Court for the Tenth Judicial District, alleging violations of the Code of Judicial Conduct and the Minnesota Constitution. Following a hearing, a three-member panel (the panel) that we appointed found that Judge Pendleton failed to reside within his judicial district from January 15, 2014, through June 2, 2014. The panel also found that Judge Pendleton knowingly made a false statement regarding his residency in his May 22, 2014 affidavit of candidacy. The panel concluded that Judge Pendleton violated Rules 1.1, 1.2, 2.1, and 4.1(A)(9) of the Code of Judicial Conduct and Article VI, Section 4, of the Minnesota Constitution. The panel recommended that Judge Pendleton be censured and suspended from judicial office without pay for at least 6 months. Judge Pendleton appealed the panel's findings, contending that the Board failed to prove that he committed judicial misconduct by clear and convincing evidence and that he was denied due process of law by irregularities in the proceedings before the Board and the panel. Judge Pendleton also appealed the panel's recommended sanctions.

We conclude that the Board has proven by clear and convincing evidence that Judge Pendleton failed to reside within his judicial district during his continuation in office and that he made a knowingly false statement regarding his residency in his affidavit of candidacy, in violation of Rules 1.1, 1.2, 2.1, and 4.1(A)(9) of the Code of Judicial Conduct and Article VI, Section 4, of the Minnesota Constitution. We further conclude that Judge Pendleton's due process claims lack merit. Finally, we conclude that the appropriate judicial discipline is removal from office.

*Procedural background*

On October 31, 2014, the Board filed a formal complaint against Judge Pendleton, alleging that he had violated the Minnesota Constitution and Rules 1.1, 1.2, 2.1, and 4.1(A)(9) of the Code of Judicial Conduct. The complaint alleged that Judge Pendleton failed to reside in the Tenth Judicial District during his term of judicial office. The complaint alleged that rather than residing in his judicial district, Judge Pendleton resided at his wife's home in Minnetonka, which is in the Fourth Judicial District, from November 26, 2013 through July 31, 2014. The complaint also alleged that Judge Pendleton made a knowingly false statement of his residence address in his May 22, 2014 affidavit of candidacy for re-election as a district court judge. We appointed a three-member fact-finding panel to conduct a hearing on the Board's allegations.

*Hearing before the three-member panel*

The panel held a hearing on January 22, 2015. The testimony at this hearing, as well as the exhibits admitted into evidence, establish the following facts. Judge Pendleton is a district court judge in the Tenth Judicial District. He was appointed in 1999, elected in 2002, and re-elected in 2008 and 2014.

Judge Pendleton is married, and his wife resides in Minnetonka. The couple married in September 2007, and except for a brief period in 2008, they maintained separate residences until November 2013.[1]

---

[1] Judge Pendleton was previously married, and he and his former wife have three sons.

3

Beginning in 2012, Judge Pendleton lived in a townhouse in Anoka.[2]  In 2013 he decided to sell the Anoka townhouse, primarily for financial reasons.  He listed the townhouse for sale in October 2013 and soon had a buyer.  The sale closed on November 27, 2013.

On November 27, 2013, Judge Pendleton moved out of the Anoka townhouse and began staying at his wife's house in Minnetonka, which is in the Fourth Judicial District.  Judge Pendleton moved the items from his Anoka townhouse into a storage unit in Hopkins, which is also in the Fourth Judicial District.  He told someone from the moving company that he intended to find a new apartment in Anoka quickly, and that he would soon call the company to move his items back to Anoka.  The billing invoice from the company that moved Judge Pendleton's furniture reflects this conversation.  But Judge Pendleton did not contact the company soon after he moved.  Rather, he stayed at his wife's house until August 1, 2014.

From late November 2013 through December 20, 2013, Judge Pendleton looked for an apartment in Anoka.  He was on vacation from December 20, 2013, through January 6, 2014.  When Judge Pendleton returned, he was out sick from work for several days.  He returned to work on Monday, January 13, 2014.

On January 15, 2014, Judge Pendleton learned that his son had been caught with drugs and drug paraphernalia at school in Anoka, and that his grades had dropped dramatically.  Judge Pendleton met with representatives of his son's school and sought

[2]    Unless otherwise noted, all cities referred to in this opinion are in the Tenth Judicial District.

4

drug treatment and tutoring for his son. By the end of January, Judge Pendleton's son was enrolled in drug counseling and intensive tutoring. Judge Pendleton spent several evenings a week, taking his son to dinner and then to either treatment or tutoring.

Judge Pendleton and his former wife discussed the possibility of moving their son from the Anoka school to a school in Andover. In order for their son to attend school in Andover, one parent would need to relocate to the attendance area for that school. Judge Pendleton and his former wife agreed to defer the decision on changing schools until they could evaluate how their son was doing in treatment and at school, but they did not set a deadline for making that decision.

Judge Pendleton made no attempt to find housing in the Tenth Judicial District from mid-January 2014 through the end of May 2014. Judge Pendleton admitted that he made a "choice" not to search for new housing in the Tenth Judicial District while the issues with his son were unresolved. He acknowledged that he could have found housing in the Andover attendance area, which would have preserved both school options for his son because his former wife lived in the Anoka attendance area, but he thought that was not a "good option" because it would have made no sense for him to live in Andover if his son went to school in Anoka. He also testified that he did not explore the possibility of a short-term lease in his judicial district because he was "focus[ed] on [his] son" and "did not know how long th[e] process [would] take" "[w]hen [he] put the search on hold."

On May 22, 2014, Judge Pendleton completed an affidavit of candidacy for the November 2014 election. The affidavit includes a space for the candidate to list his or

her "residence address," but it also indicates that "[a]ll address and contact information is optional for" judicial candidates. Judge Pendleton listed on the affidavit of candidacy the address for the Anoka townhouse that he sold in November 2013, even though he had not lived there since the sale.

Judge Pendleton admitted that at the time he filled out the affidavit of candidacy, he "knew that that was not an accurate statement." He testified that he was "in a rush" when he filled out the affidavit of candidacy because he had to get back for court and that it was "a spontaneous, split-second decision" to list his previous, Anoka County, address. He further testified that he "was not thinking of my wife's home as my home or my address or my residence." Judge Pendleton admitted that using the wrong address was an "error of judgment" and "created an appearance of impropriety," but he denied any "intent to deceive the electorate."

On June 2, 2014, there was an incident at Judge Pendleton's current wife's house between one of his other sons and one of his stepdaughters. The police were called. As a result of this incident, Judge Pendleton testified his former wife stopped talking to him. That decision caused Judge Pendleton to believe that his son who attended school in Anoka would not be transferring schools.

Judge Pendleton resumed his search for housing in the Tenth Judicial District after the June 2 incident. On June 6, 2014, he talked to the manager of an apartment building in Ramsey and decided to rent a unit that would be available August 1, 2014. Judge Pendleton viewed the apartment on July 5, 2014. That same day, he filled out a rental

application. On July 7, 2014, he paid the deposit and signed the lease, and then he moved in on August 1, 2014.

In addition to this evidence regarding Judge Pendleton's residence, the Board also introduced evidence regarding Judge Pendleton's efforts to explain his residential situation. Specifically, Judge Pendleton had communicated with David Paull, who was the Executive Secretary for the Board at the time, and judges and administrators in his district regarding his residency. In August 2005, after he had separated from his former wife, Judge Pendleton told Paull of his impending divorce and his intent to live with or marry his current wife, who was then living outside the Tenth Judicial District, when his divorce became final. He sought advice on handling his residency obligation. Paull informed him that other judges in similar situations had maintained a residence in their district of election.

In November 2010, Judge Pendleton contacted Paull after receiving a phone call from Judge Patricia Karasov, whose judicial disciplinary proceeding for residing outside of her judicial district was pending. During this call, Judge Karasov accused Judge Pendleton of living outside of his district. Paull told Judge Pendleton that his situation was different from Judge Karasov's because he owned a home in his judicial district and stayed there during the week, while Judge Karasov had rented out her house in her judicial district.

That same month, Judge Pendleton sent an e-mail to the other judges and some court administrators in his judicial district to address what he referred to as a "persistent rumor that I do not reside in the district." He disclosed that his wife and her daughters

7

lived in Minnetonka and that he owned a townhouse in Blaine. He also said that he "ha[d] provided full disclosure to the Minnesota Board of [sic] Judicial Standards" and that he was in "full compliance with all residency requirements."

While he was staying at his wife's house in Minnetonka in 2013-2014, Judge Pendleton did not disclose his changed living situation to Paull or the successor Executive Secretary of the Board. He told a few judges that his son was having drug problems, but he did not tell any of them that he was staying in Minnetonka. Judge Pendleton told only his court reporter and law clerk where he was staying.

The Tenth Judicial District maintains a confidential directory of addresses and telephone numbers of judges. Approximately three to four times per year, an e-mail is sent to judges asking them to update their information in this directory. There is no requirement that judges provide this information.

On April 2, 2012, Judge Pendleton notified the Tenth Judicial District Administrator (the Court Administrator) that he had "moved over the weekend" and provided him with the address of his Anoka townhouse. After this date, the confidential directory listed the Anoka townhouse as Judge Pendleton's address. Between November 2013 and August 2014, Judge Pendleton did not inform the Court Administrator that he was living in Minnetonka, despite receiving requests for updated information for the directory on December 31, 2013, March 31, 2014, and July 14, 2014.

Without having received a request for an updated address, Judge Pendleton sent the Court Administrator an e-mail on August 7, 2014, stating that the address for his Ramsey apartment was his new address as of August 1. On October 1, 2014, Judge

8

Pendleton received the quarterly e-mail with the directory, which continued to list the Anoka townhouse as his address. Within minutes of receiving this e-mail, Judge Pendleton replied that his address was wrong and provided the address for the Ramsey apartment.

Judge Pendleton testified that he considered himself to be a resident of the Tenth Judicial District since 1995. He has voted in Anoka County for the past 20 years. Judge Pendleton also banked, had his car repaired, had his prescriptions filled, and saw a doctor in Anoka. After he and his current wife were married, Judge Pendleton received mail at a post office box outside the Tenth Judicial District that his wife had established for her business. After he purchased his Anoka townhouse, Judge Pendleton listed his Anoka townhouse as the address on his driver's license until August 2014, when he changed the address to his Ramsey apartment.

*The panel's findings and recommended sanction*

The panel found that the Board had proved by clear and convincing evidence that Judge Pendleton was not a resident of his judicial district from January 15, 2014, through June 2, 2014.[3] The panel found that "[b]eginning November 27, 2013, Judge Pendleton

---

[3] The panel found that the Board had "not proven by clear and convincing evidence that Judge Pendleton failed to reside within his judicial district between November 27, 2014 [sic] and January 14, 2014 or between June 3, 2014 and July 31, 2014" because the "evidence reflects that Judge Pendleton was actively pursuing replacement housing in the 10th Judicial District" during those times. The Board has not appealed the panel's conclusions with respect to Judge Pendleton's residency either before January 15, 2014, or after June 2, 2014. As a result, we do not decide whether any of the panel's findings with respect to Judge Pendleton's residency before January 15, 2014, or after June 2, 2014, such as the panel's determination that Judge Pendleton's apartment search efforts

(Footnote continued on next page.)

did not have a place to live in the 10th Judicial District." Although Judge Pendleton "initially made efforts to retain new housing, [he] suspended his housing search completely between January 15, 2014, and June 2, 2014." The panel rejected Judge Pendleton's claim that he intended to remain a resident of the Tenth Judicial District during this time. Instead, the panel concluded that "the evidence supports the inference that [Judge Pendleton] intended to abandon his residency within the district while addressing familial issues." According to the panel,

> Judge Pendleton voluntarily decided to live with his wife in Minnetonka for an indefinite period of time until he and his first wife figured out where his son would go to school. Judge Pendleton's failure to disclose his living situation during this time period—particularly in light of his previous disclosures to both his colleagues and to Paull—belies [his] assertion that he intended to remain a resident of the 10th Judicial District.

The panel concluded that "[b]y failing to reside within his judicial district from January 15, 2014, through June 2, 2014, Judge Pendleton violated Article VI, Section 4, of the Minnesota Constitution" and Rules 1.1, 1.2, and 2.1 of the Code of Judicial Conduct.

The panel further found that the Board proved, "by clear and convincing evidence, that Judge Pendleton knowingly made a false statement in the May 22, 2014 affidavit of candidacy." According to the panel, "Judge Pendleton concede[d] that he ha[d] not lived at the address he provided on the affidavit for more than six months." The panel found

---

(Footnote continued from previous page.)
were sufficient to establish residency, were clearly erroneous. We likewise do not decide whether a judge who moves outside his judicial district can reacquire residency in his district after it has been lost.

10

"Judge Pendleton's testimony that he lacked any intent to deceive incredible when viewed in the context of the whole record."  It concluded that "[b]y knowingly making a false statement in the May 22, 2014 affidavit of candidacy, Judge Pendleton violated" Rules 1.1, 1.2, and 4.1(A)(9) of the Code of Judicial Conduct.

For these violations, the panel recommended that Judge Pendleton be censured and suspended from judicial office without pay for at least 6 months.  The panel was divided on the appropriate suspension, with members' views ranging from 6 to 16 months.

We heard oral argument on the matter on September 8, 2015.  That same day we suspended Judge Pendleton with pay under Rule 15(b), of the Rules of Board on Judicial Standards (RBJS), pending this opinion.

I.

When a judge's conduct violates the Code of Judicial Conduct, that misconduct is a ground for judicial discipline.  Rule 4(a)(6), RBJS.  The Board has the burden of proving by clear and convincing evidence that a judge engaged in the misconduct.  Rule 10(b)(2), RBJS.  Clear and convincing evidence requires that "the truth of the facts asserted is 'highly probable.' "  *In re Miera*, 426 N.W.2d 850, 853 (Minn. 1988) (quoting *Weber v. Anderson*, 269 N.W.2d 892, 895 (Minn. 1978)).

We "make an independent assessment of whether the Board has proven that a judge violated a provision of the Code of Judicial Conduct."  *In re Karasov*, 805 N.W.2d 255, 264 (Minn. 2011); *see also* Rule 14(e), RBJS.  In making this assessment, however, we "giv[e] deference to the facts" found by the panel.  Rule 14(e), RBJS.  As a result, we

11

"will defer to the panel's factual findings unless they are clearly erroneous." *Karasov*, 805 N.W.2d at 264.

The Board contends that Judge Pendleton engaged in judicial misconduct by residing outside of his judicial district from January 15, 2014, through June 2, 2014 and by making a knowingly false statement of fact regarding his residency in his May 2014 affidavit of candidacy. Judge Pendleton disputes that the Board has proven by clear and convincing evidence that he resided outside of his judicial district or that he made a knowingly false statement in the affidavit of candidacy. Applying the standard of review just articulated, we consider each claim of judicial misconduct in turn.

A.

We turn first to the charge that Judge Pendleton violated Rules 1.1, 1.2, and 2.1 of the Code of Judicial Conduct and Article VI, Section 4, of the Minnesota Constitution by failing to reside in his judicial district during the period from January 15, 2014 through June 2, 2015.[4] The Minnesota Constitution requires that "[e]ach judge of the district court . . . shall be a resident of that district at the time of his selection and during his continuance in office." Minn. Const. art. VI, § 4.

In deciding whether a district court judge has complied with the Minnesota Constitution's residency requirement, we have adopted the test used for determining if

---

[4]    Rule 1.1 of the Code of Judicial Conduct states, "[a] judge shall comply with the law, including the Code of Judicial Conduct." Rule 1.2 states, "[a] judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." Rule 2.1 states, "[t]he duties of judicial office, as prescribed by law, shall take precedence over all of a judge's personal and extrajudicial activities."

12

legislators have complied with the Minnesota Constitution's requirement that they reside in the district from which they are elected. *In re Karasov*, 805 N.W.2d 255, 265 (Minn. 2011). This test " 'focus[es] on physical presence and intent, as we have done in the voter residency context.' " *Id.* at 264 (quoting *Piepho v. Bruns*, 652 N.W.2d 40, 44 (Minn. 2002)); *see also id.* (stating that the test to determine residency is best summarized in the voter residency statute, which states " 'the mere intention to acquire a new residence, is not sufficient to acquire a new residence, unless the individual moves to that location; moving to a new location is not sufficient to acquire a new residence unless the individual intends to remain there' " (quoting Minn. Stat. § 200.031(i) (2010)). The two factors of physical presence and intent " 'inform' each other and 'neither . . . is determinative.' " *Id.* (quoting *Piepho*, 652 N.W.2d at 44). Put differently, " 'intent can be demonstrated in many ways, including but not limited to physical presence, and we consider physical presence to the extent that it manifests intent to reside in the district.' " *Id.* at 264-65 (quoting *Piepho*, 652 N.W.2d at 44). And the residency factors "are 'largely questions of fact.' " *Id.* at 265 (quoting *Studer v. Kiffmeyer*, 712 N.W.2d 552, 558 (Minn. 2006)).

Judge Pendleton challenges the panel's findings related to his intent to reside at his wife's home in Minnetonka in 2014. Specifically, he claims the panel's finding that he intended to abandon his residency in the Tenth Judicial District during this period is clearly erroneous and that his words and actions demonstrate his intent to remain a resident of the Tenth Judicial District. The evidence, Judge Pendleton argues, shows that he unexpectedly found himself without a home in his judicial district because of a family

13

emergency related to his son and that he was only temporarily staying in Minnetonka until the crisis was resolved. Judge Pendleton further argues the panel ignored key facts when it made its findings regarding his intent to abandon his residency in the Tenth Judicial District, including that: he moved his personal property and furniture into storage and not into his wife's house; he told the moving company when he moved out of his Anoka townhouse that he would be quickly moving back to Anoka; and he voluntarily returned to his judicial district by obtaining an apartment in Ramsey before he knew the Board was investigating his residency.

The Board contends that the panel's findings that Judge Pendleton lacked both physical presence and intent to reside in the Tenth Judicial District from January 15, 2014, to June 2, 2014, are not clearly erroneous. The Board asserts that it is undisputed that Judge Pendleton had no physical presence in the Tenth Judicial District for more than 4 ½ months during 2014. The Board further argues that the panel's finding that Judge Pendleton intended to abandon his residency in the Tenth Judicial District while addressing family issues is fully supported by the record.

We agree with the Board that it proved by clear and convincing evidence that Judge Pendleton resided outside of his judicial district from January 15, 2014, through June 2, 2014. The panel's findings regarding Judge Pendleton's physical presence and intent are not clearly erroneous. Based on these findings, it is at least "highly probable" that Judge Pendleton resided at his wife's home in Minnetonka during this period of time. *See Miera*, 426 N.W.2d at 853 (stating that the clear and convincing standard is met when "the truth of the facts asserted is highly probable").

14

With respect to physical presence, the record supports the panel's findings that beginning November 27, 2013, Judge Pendleton did not have a place to live in the Tenth Judicial District. It is undisputed that from November 27, 2013, through August 1, 2014, Judge Pendleton had no place to stay and owned no property in the Tenth Judicial District. The record demonstrates that Judge Pendleton had no place to stay in his judicial district for over 7 months because he chose to sell his townhouse in Anoka for financial reasons and voluntarily chose not to have replacement housing in his judicial district when the sale was finalized. It is also undisputed that during this time, Judge Pendleton was living in Minnetonka at his wife's house, outside his judicial district, and had moved his furniture into a storage facility that was also located outside of his judicial district, and not far from his wife's home.

Regarding intent, the panel's findings that Judge Pendleton did not intend to remain a resident of the Tenth Judicial District from January 15, 2014, through June 2, 2014, and that instead, he intended to abandon his residency within his judicial district while he addressed family issues, are not clearly erroneous. During this period of time, Judge Pendleton did not look for housing within his judicial district. Judge Pendleton's failure to take reasonable steps to obtain housing in his judicial district for over 4 1/2 months is strong evidence he intended to remain and reside at his wife's house in Minnetonka. *See Karasov*, 805 N.W.2d at 267 (stating that "[b]y failing to take reasonable steps to find a new place to live in [her judicial district], Judge Karasov revealed her intent to remain and reside at her lake home" outside of her judicial district). The record establishes that it was Judge Pendleton's choice not to look for housing and to

15

remain at his wife's home in Minnetonka during this time, despite having housing options available to him within his judicial district that would have accommodated his family issues. *See id.* at 266 (explaining that Judge Karasov's intent to remain at her lake home outside of her judicial district was demonstrated by her "deliberate choice[] not" to "secure a new residence in her judicial district," despite "ample time to secure a new residence in her judicial district" after renting out her townhouse). And the fact that Judge Pendleton had no deadline for resolving his son's school issue and instead was living in Minnetonka for an indefinite period provides further evidence that he intended to reside in Minnetonka while he addressed his family issues. *See* Minn. Stat. § 200.031(e) (2014) ("[I]f an individual moves to another state with the intention of living there for an indefinite period, the individual loses residence in this state, notwithstanding any intention to return at some indefinite future time[.]").

Judge Pendleton's intent to reside at his wife's house is further demonstrated by the steps he took to keep the fact he was staying in Minnetonka a secret, including making affirmative misrepresentations regarding his residency. Six months after he sold his Anoka townhouse, Judge Pendleton lied on his affidavit of candidacy by listing his former Anoka townhouse as his residence. His knowingly false statement of his residency is strong circumstantial evidence that Judge Pendleton believed he was residing in Minnetonka at the time he made this statement and that he was trying to hide this fact. *See Karasov*, 805 N.W.2d at 266 n.7 (explaining that intent "is often proved circumstantially by looking at a person's conduct and inferring from that conduct a person's mental state"). This is so because when he listed a false address in his judicial

16

district on his affidavit of candidacy, Judge Pendleton knew the Minnesota Constitution required him to reside in his judicial district. It is reasonable to conclude, as the panel did, that Judge Pendleton falsely stated he was residing in his judicial district because he understood his current living arrangement was improper.

Judge Pendleton took other steps to keep his living situation in Minnetonka secret. Despite having consulted with the Board's Executive Secretary on several prior occasions about his residency, Judge Pendleton did not inform the Board's Executive Secretary that he had sold his Anoka townhouse, that he was living with his wife in Minnetonka, or that he had suspended his search for housing in his judicial district because of the issues with his son. Judge Pendleton also did not provide the Minnetonka address for the Tenth Judicial District's confidential judge directory when he had promptly informed the Court Administrator of other address changes before and after he sold his Anoka townhouse. Like the false statement of residency in his affidavit of candidacy, this is additional circumstantial evidence that Judge Pendleton intended to reside in Minnetonka and that he was trying to conceal this fact. It is reasonable to conclude that Judge Pendleton did not tell the Board's Executive Secretary or the Court Administrator that he was living in Minnetonka because he knew his living situation was improper, and he did not want others to know about it.

We acknowledge there is evidence in the record that would support the conclusion that Judge Pendleton intended to remain a resident of the Tenth Judicial District from January 15, 2014, through June 2, 2014, and was only temporarily staying at his wife's house in Minnetonka during this period. The panel, however, rejected this conclusion

17

after considering the record as a whole.[5] The panel's findings regarding Judge Pendleton's intent are not clearly erroneous simply because there is some contrary evidence in the record. *Karasov*, 805 N.W.2d at 268 n.10 (concluding that the panel's findings regarding Judge Karasov's intent were not clearly erroneous, even though there was contrary evidence in the record and stating that the court should not "impermissibly weigh[] the evidence and substitut[e] its judgment for that of the panel's regarding Judge Karasov's intent").

When we consider the factors of physical presence and intent, we conclude that the Board established by clear and convincing evidence that Judge Pendleton did not reside in his judicial district from January 15, 2014, through June 2, 2014, in violation of Minn. Const. art. VI, § 4. By not residing in his judicial district during this period, Judge Pendleton "acted in a manner suggesting that constitutional requirements do not apply to

---

[5] Judge Pendleton argues that the panel's findings regarding his intent "deserve[] no deference" because the panel's written findings make no reference to certain evidence in the record. Namely, the panel's findings exclude discussion of Judge Pendleton's testimony that he told the moving company that moved him out of his Anoka townhouse in November 2013 that he would be moving back to Anoka soon and a billing invoice from the movers that corroborated this statement. Judge Pendleton's claim, however, is contrary to applicable law. *See In re Children of T.R.*, 750 N.W.2d 656, 660-61 (Minn. 2008) ("A finding is clearly erroneous if it is either 'manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole.' " (quoting *Tonka Tours, Inc. v. Chadima*, 372 N.W.2d 723, 726 (Minn. 1985)); *Rogers v. Moore*, 603 N.W.2d 650, 656 (Minn. 1999) ("As we noted recently, '[f]indings of fact are clearly erroneous only if the reviewing court is left with the definite and firm conviction that a mistake has been made.' " (quoting *Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101 (Minn. 1999)). Moreover, it is clear the panel carefully considered all of the evidence in this case and concluded that, although Judge Pendleton intended to remain a resident of the Tenth Judicial District when he initially moved out of his Anoka townhouse in November 2013, his intent changed with the passage of time and that, beginning in early 2014, he intended to reside at his wife's house in Minnetonka.

[him]." *Karasov*, 805 N.W.2d at 268. As a result, Judge Pendleton created an appearance of impropriety, he did not act in a manner that promotes confidence in the integrity of the judiciary, and he allowed his personal activities to take precedence over the duties of his judicial office. *See id.* (holding a judge violated Rules 1.1 and 1.2 of the Code of Judicial Conduct by residing outside of her judicial district). We therefore hold that Judge Pendleton's conduct violated Rules 1.1, 1.2, and 2.1 of the Code of Judicial Conduct.

B.

We next address the panel's finding that Judge Pendleton made a knowingly false statement in his affidavit of candidacy, in violation of Rules 1.1, 1.2, and 4.1(A)(9) of the Code of Judicial Conduct. Rule 1.2 states: "A judge shall act at all times in a manner that promotes public confidence in the independence, integrity, and impartiality of the judiciary, and shall avoid impropriety and the appearance of impropriety." Integrity is defined as "probity, fairness, honesty, uprightness, and soundness of character." Terminology Section, Code of Judicial Conduct. A judge violates Rule 1.2 by making a knowingly false statement. *In re Perez*, 843 N.W.2d 562, 565-67 (Minn. 2014) (concluding that a judge violated Rule 1.2 by falsely certifying that he had complied with certain deadlines when he knew some of the certifications were false).

Rule 4.1 addresses political and campaign activities of a judge. *See generally* Rule 4.1, Code of Judicial Conduct. Specifically, Rule 4.1(A)(9) states: "Except as permitted by law, or by Rules 4.2, 4.3, and 4.4, a judge or a judicial candidate shall

not . . . knowingly, or with reckless disregard for the truth, make any false or misleading statement."

The Board proved by clear and convincing evidence that Judge Pendleton violated Rules 1.2 and 4.1(A)(9) by making a knowingly false statement about his residence address on his affidavit of candidacy.[6] At the time Judge Pendleton completed his affidavit of candidacy, he had sold his Anoka townhouse and had not lived there for approximately 6 months. Despite these facts, he listed the townhouse as his residence address. Judge Pendleton admitted that he knew this address was not accurate when he completed the affidavit. These admissions establish that Judge Pendleton made a knowingly false statement of fact on his affidavit of candidacy.

Judge Pendleton argues the panel incorrectly concluded he violated Rule 1.2 and Rule 4.1(A)(9) when he listed an incorrect address on the affidavit of candidacy. He claims that the panel erroneously focused on his act of listing an outdated address when determining his state of mind and ignored his testimony about his conduct before, during, and after he completed the affidavit. Judge Pendleton denies he had any intent to deceive.

---

[6] Judge Pendleton partially admitted this charge. He admitted that by making a false statement in his affidavit of candidacy, he created an appearance of impropriety, in violation of Rule 1.2. At oral argument, Judge Pendleton also admitted he violated Rule 4.1(A)(9), but it appears this admission was limited to making a false statement in "reckless disregard for the truth." The panel, however, found Judge Pendleton made a "knowingly" false statement in the affidavit of candidacy. As a result, we address whether the Board proved that Judge Pendleton made a knowingly false statement in his affidavit of candidacy.

20

Judge Pendleton's argument is without merit because deceptive intent is not required to prove a violation of the rules. The relevant inquiry is whether Judge Pendleton made a *knowingly* false statement. *See* Rule 4.1(A)(9), Code of Judicial Conduct; *Perez*, 843 N.W.2d at 565-67. Judge Pendleton's own testimony supports the panel's conclusion that he made a knowingly false statement.

Moreover, even if these rules required a finding that the judge intended to deceive, intent to deceive may be proven by showing a person made a knowingly false statement of fact. *See In re Czarnik*, 759 N.W.2d 217, 223 (Minn. 2009) (rejecting attorney's argument that his false statements about payments from a company were not made with intent to deceive because "the referee found" the attorney "made false statements with knowledge of their falsity" and "nothing beyond these findings" is required "to demonstrate [he] acted with intent to deceive"); *Florenzano v. Olson*, 387 N.W.2d 168, 173 (Minn. 1986) (stating that "a representation is made with fraudulent intent when it is known to be false" and that "[t]here is no doubt of fraudulent intent when the misrepresenter knows or believes the matter is not as he or she represents it to be"). The panel's finding that Judge Pendleton intended to deceive people when he listed an incorrect address within his judicial district on the affidavit of candidacy is supported by Judge Pendleton's admission that he knew he listed a false address on the affidavit. And he made no effort, before or after the filing deadline, to correct his false statement.

Finally, the panel rejected Judge Pendleton's claim that he "lacked any intent to deceive" because it was "incredible when viewed in the context of the whole record." The panel was free to reject Judge Pendleton's testimony on this issue. *Cf. In re Voss*,

21

830 N.W.2d 867, 874-75 (Minn. 2013) (stating that a referee in an attorney discipline case is free to reject the testimony of an attorney as "not credible"). In light of the panel's credibility determination and the evidence in the record to support its conclusion, the panel's finding that Judge Pendleton intended to deceive is not clearly erroneous. *See Karasov*, 805 N.W.2d at 267-68 (concluding the panel did not clearly err by rejecting judge's testimony regarding her intent).

In summary, we conclude that the Board has proven by clear and convincing evidence that Judge Pendleton made a knowingly false statement when he listed an incorrect address in his judicial district as the address of his residence on his May 2014 affidavit of candidacy. Based on this conclusion and Judge Pendleton's admission of rule violations, we hold that Judge Pendleton violated Rules 1.1, 1.2, and 4.1(A)(9) of the Code of Judicial Conduct.

## II.

We next turn to Judge Pendleton's claims that his right to due process was violated in this proceeding. The judicial discipline system "is neither civil nor criminal in nature, but sui generis, designed to protect the citizenry by insuring the integrity of the judicial system." *In re Gillard*, 271 N.W.2d 785, 812 (Minn. 1978). Although criminal due process guarantees do not apply, we have recognized that "general due process rights to fair and regular proceedings do attach." *Id.*; *see also In re Kirby*, 354 N.W.2d 410, 415 (Minn. 1984) (noting that "[a] judge is guaranteed due process of law in a disciplinary investigation and hearing"). Our cases reflect that "[t]hese rights include '[t]he opportunity to be heard at a meaningful time and in a meaningful manner,' and the right

22

to notice of the charges against the judge so he or she has an opportunity to prepare and present a defense." *In re Karasov*, 805 N.W.2d 255, 270 (Minn. 2011) (quoting *Kirby*, 354 N.W.2d at 415).

We have also addressed the importance of the Board following its rules of procedure, explaining that "[a]dherence to its . . . rules of procedure will ensure" that an investigation into a judge's conduct is objective and that the investigation does "not give the appearance of being[] a witch hunt." *Kirby*, 354 N.W.2d at 416. At the same time, we have clearly held that "[v]ariations from or violations of the Rules of the Board on Judicial Standards during the investigation or hearing process, however, do not, in and of themselves, constitute a due process violation." *Karasov*, 805 N.W.2d 271; s*ee also Kirby*, 354 N.W.2d at 416 (holding that although the Board violated its own rules, which required giving the judge an opportunity to respond to each allegation prior to making the allegations public, the judge was not denied due process of law); *Gillard*, 271 N.W.2d at 812-13 (holding in response to an argument that the Board acted without a quorum as required by its rules, that "[b]ecause this court conducts an independent review of the evidence and accords the Judicial Board's disciplinary recommendations no presumptive weight, the absence of a quorum should not be fatal").

Judge Pendleton contends his right to due process of law was violated by serious irregularities in the proceedings. Judge Pendleton's due process claims include that the Board: (1) refused to inform him that it was investigating his affidavit of candidacy; (2) improperly asked about his sex life when he appeared before the Board; (3) violated the discovery deadline by disclosing documents in an untimely fashion and solicited

inadmissible evidence at the panel hearing; and (4) alleged theories and arguments not charged in the complaint.[7]  We will address these claims in turn.

A.

Judge Pendleton claims that his right to due process was violated because he was not told, prior to testifying before the Board on August 15, 2014, that he would be asked about his affidavit of candidacy.  Judge Pendleton's claim is based, in part, on his contention that the Board's notice of investigation failed to comply with applicable Board rules.  Judge Pendleton also claims that the failure to inform him that he would be questioned about the affidavit prior to his testimony before the Board violates his right to due process under the analysis in *In re Ruffalo*, 390 U.S. 544 (1968).

---

[7]    Judge Pendleton also claims that the Board violated his right to due process because it "failed to identify the source of the initial report or reveal that it had become the complainant against" him, in violation of Rule 6(d)(2)(iv), RBJS, and that the Board gave him "less than the required 20 days' notice before summoning him to appear before the Board for sworn testimony," in violation of Rule 6(d)(6), RBJS.  Judge Pendleton makes these arguments in just two sentences, without any legal analysis of his claims.  As a result, these claims could be considered waived.  *See Karasov*, 805 N.W.2d at 271 n.12 (concluding that a judge's due process arguments that were made in a summary fashion, without "cit[ing] to applicable law" or "engag[ing] in an[y] analysis of the law to substantiate her claims," were waived).

Even if the claims are not waived, this conduct did not violate Board rules.  The Board may withhold the identity of a complainant from a judge if there is good cause for doing so.  Rule 6(d)(2)(iv), RBJS.  The Board concluded there was good cause for not disclosing the identity of the complainant, and Judge Pendleton has not challenged this good-cause determination.  The Board also may expedite investigations made against a judge "who is a candidate for judicial office if the complaint was filed after the statutory filing period for judicial office had opened."  Rule 6(e), RBLS.  Because the conditions outlined in Rule 6(e) were satisfied in this case, the Board was permitted to shorten the 20-day notice requirement that generally applies to an appearance before the Board.  *See* Rule 6(d)(6), RBJS (requiring 20 days' notice before a judge testifies before the Board during an investigation).

The record in this case establishes that in a July 15, 2014 letter, the Board's Executive Secretary Thomas Vasaly notified Judge Pendleton that he had "received information that [he] may have been living" at his wife's house in Minnetonka "for significant periods of time over the last several years." The letter indicated the Board was investigating this potential misconduct. It also stated that "[t]he Board's investigation can be expanded if appropriate."

The Board asked Judge Pendleton to appear before it for questioning under oath on August 15, 2014. Before the meeting, Judge Pendleton called Vasaly to ask what topics would be addressed at the meeting. Vasaly replied that the meeting would be limited to the residency issue. By the time of the telephone call, Vasaly had obtained a copy of Judge Pendleton's affidavit of candidacy and knew it listed the address for Judge Pendleton's Anoka townhouse. Vasaly had also received a written response from Judge Pendleton stating that he sold this townhouse in November 2013. Vasaly did not disclose the affidavit of candidacy as a separate issue that would be addressed at the August 15 meeting because he viewed it as related to the residency issue that had been disclosed to Judge Pendleton.

During the August 15 meeting before the Board, Judge Pendleton was asked about the affidavit of candidacy. Although Judge Pendleton was asked whether the address listed was inaccurate and he confirmed that it was, the vast majority of the questions linked the inaccurate address to the question of his residency.

The better practice would have been to inform Judge Pendleton, prior to his appearance before the Board, that the Board intended to question him about the affidavit

25

of candidacy. But Judge Pendleton has not demonstrated that his due process rights were violated by the Board not telling him ahead of time that he would be asked about the affidavit of candidacy.

The Board gave Judge Pendleton the notice required by its rules. The Board must, "[w]ithin ten (10) business days after an investigation has been authorized by the board," give the judge being investigated notice that includes "a specific statement of the allegations and possible violations of the Code of Judicial Conduct being investigated, including notice that the investigation can be expanded[.]" Rule 6(d)(2), RBJS. At the time it sent the July 15 letter, the Board only had information that Judge Pendleton may have been living outside of his judicial district. The July 15 letter listed this allegation specifically, including the rules that may have been violated, and notified Judge Pendleton that the investigation could be expanded. The Board obtained the affidavit of candidacy after it sent the notice. Although the Board expanded the scope of its investigation to include the affidavit of candidacy, Rule 6(d)(2) did not require that the Board send an additional notice to Judge Pendleton about the expanded investigation.

Moreover, we rejected a similar due process argument in *In re Karasov*, 805 N.W.2d 255 (Minn. 2011). Judge Karasov argued her due process rights were violated because the Board did not give her notice that it had begun an investigation into her residency. *Karasov*, 805 N.W.2d at 273. We explained that although "[d]ue process certainly requires notice of the charges of misconduct," an "investigation is done to determine whether there is reasonable cause to believe the judge has committed

26

misconduct and whether charges should be brought." *Id.* Accordingly, we held "due process does not require notice of a judicial discipline investigation." *Id.* at 274.

Finally, the Supreme Court's decision in *In re Ruffalo* does not support Judge Pendleton's due process claim. In *Ruffalo*, the Ohio Supreme Court disbarred an attorney for committing an act of misconduct that was added after an original charge of misconduct had been filed with the court and was based on his testimony at a hearing on the original charge. 390 U.S. at 546-47. The Supreme Court concluded the Ohio disciplinary procedure violated due process because the lawyer was not given sufficient notice before the hearing of the charge of misconduct that led to his disbarment. *Id.* at 550-52 (explaining that the proceedings "become a trap when, after they are underway, the charges are amended on the basis of testimony of the accused").

*Ruffalo* is distinguishable because it did not involve the investigatory phase of a disciplinary proceeding; instead, *Ruffalo* involved testimony given during the hearing on the charges after the disciplinary proceedings had begun. *Id.* at 546-47. It is undisputed that Judge Pendleton eventually had notice of the charge related to the false statement in his affidavit of candidacy because it was included in the complaint the Board filed with this court. Accordingly, we hold that Judge Pendleton has not proven a due process violation because he did not know that he was going to be asked about the affidavit of candidacy when he appeared before the Board.

B.

Judge Pendleton contends that he was denied due process of law because he was asked a question about his relationship with his wife when he testified before the Board.

27

Specifically, Judge Pendleton was asked, "[W]hen did you begin your relationship with your current wife." Judge Pendleton responded he was "not sure" what was being asked because he had known his wife since they were teenagers. He was then asked, "When did you begin an intimate relationship with your present wife." Judge Pendleton gave a date, and no further questions were asked about this topic. Judge Pendleton argues this question violated *In re Agerter,* 353 N.W.2d 908 (Minn. 1984).

*Agerter* involved a writ of prohibition the Board sought that would have prevented a district court from quashing a subpoena that compelled a judge to appear before the Board and answer questions about a complaint that alleged the judge had alcohol problems and was having sexual relations with the complainant's wife. 353 N.W.2d at 910. We held that the Board could compel the judge to answer questions about an alcohol problem, but under the specific facts of that case, it could not compel the judge "to answer questions about his private sex life." *Id.* at 914. We recognized a judge's right to privacy had to be balanced against the important public interest of the integrity of the judiciary. *Id.* at 914-15. In order "[t]o justify intrusion into Judge Agerter's right of privacy," we concluded that the "Board must have before it, as a bare minimum, an allegation or some information of publicly known misconduct" about which the judge's sexual relations would be relevant. *Id.* at 915. *Agerter* did not involve a due process question. Accordingly, that case does not support the conclusion that there was a due process violation here.

While we do not condone the Board's question and doubt that the topic was relevant to the issue of Judge Pendleton's residence, the Board's single invasive question

28

did not rise to the level of a due process violation. The Board did not use the question and answer in an attempt to prove any of the charges against Judge Pendleton. And Judge Pendleton does not suggest that the question influenced the panel's decision in any way or affected the fundamental fairness of the proceeding before the panel or our court. *See Kirby*, 354 N.W.2d at 416 (holding that while the Board violated its own rules, the judge was not denied due process because the Board's actions did not "raise the concern that fundamental fairness may not have attached"). We therefore hold that Judge Pendleton has not demonstrated that his right to due process was violated by being asked a question about when he began his intimate relationship with his wife.

## C.

Judge Pendleton argues his right to due process was violated based on the Board's conduct before the panel. Specifically, Judge Pendleton argues the Board failed to produce documents in a timely fashion, in violation of applicable rules. He also claims the Board admitted prejudicial evidence of other bad acts in violation of Minn. R. Evid. 404(b).

Judge Pendleton has identified two categories of documents that were produced in an untimely manner by the Board. One day before the panel hearing, the Board provided Judge Pendleton with a copy of his 2008 bankruptcy petition and related schedules. The petition and related schedules were not admitted into evidence at the panel hearing. In addition, a few days before the panel hearing, the Board provided Judge Pendleton with copies of documents it had received from the Court Administrator for the Tenth Judicial District. These documents consisted of e-mails from Judge Pendleton informing the

29

Court Administrator of address changes and e-mails regarding the confidential judges' directory. The Board obtained these documents in response to a subpoena it had served approximately 1 week before the panel hearing. Judge Pendleton objected to the admission of these documents because they were not produced in a timely fashion. Despite the objection, these documents were admitted into evidence at the panel hearing.

The Board's rules and the panel's scheduling order required the parties to exchange "non-privileged evidence relevant to the Formal Complaint" and documents to be presented at the hearing by December 29, 2014. *See* Rule 9(b), (e), RBJS. Although the Board's untimely disclosure of these documents violated the Board's rules, such a violation, in and of itself, is not a due process violation. *Karasov*, 805 N.W.2d at 271 ("Variations from or violations of the Rules of the Board on Judicial Standards during the investigation or hearing process, however, do not, in and of themselves, constitute a due process violation."). Further, Judge Pendleton has not identified any actual prejudice caused by the late disclosure of these documents, some of which he himself generated. *See Kirby*, 354 N.W.2d at 416 (holding that although the Board violated its own rules, the judge was not denied due process because the Board's actions did not "raise the concern that fundamental fairness may not have attached"). Because Judge Pendleton has not shown prejudice, we hold that the untimely disclosure of these documents did not violate his right to due process.

Judge Pendleton further argues his right to due process was violated by the Board's improper questioning during the panel hearing. At the panel hearing, Judge Pendleton objected to the Board's questions about where he lived in 2008 as irrelevant

30

and beyond the scope of the charges, which related to his residency in 2013 and 2014. The Board argued the evidence was relevant and admissible under Minn. R. Evid. 404(b) to show Judge Pendleton's intent to reside with his wife outside of his judicial district in 2014 for personal reasons. The questions were allowed.[8]

The rules of evidence apply to the panel hearing, Rule 10(a), RBJS, but they are to be liberally construed. *In re Miera*, 426 N.W.2d 850, 855 (Minn. 1988). Under Rule 404(b), "[e]vidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith." Minn. R. Evid. 404(b). Such evidence may be admissible, however, "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* We review whether evidence was properly admitted for an abuse of discretion. *See State v. Blom*, 682 N.W.2d 578, 611 (Minn. 2004) (stating that a trial court's decision to admit evidence under Rule 404(b) is reviewed for an abuse of discretion).

Judge Pendleton has not shown the panel presider abused his discretion by admitting evidence about where Judge Pendleton lived in 2008. While Judge Pendleton contends the Board failed to give him notice of its intent to use this other bad-acts evidence at the panel hearing, notice of other bad-acts evidence is required only in

---

[8] Judge Pendleton testified that for approximately 7 months in 2008, he lived with his wife outside of the Tenth Judicial District after he lost a home he had owned in Albertville due to foreclosure. Counsel for the Board represented to our court that he realized for the first time the day before the panel hearing that the schedules attached to Judge Pendleton's bankruptcy petition listed an address outside of the Tenth Judicial District during 2008.

criminal cases. *See* Minn. R. Evid. 404(b). Judge Pendleton also claims the Board "made no effort to articulate a permissible use under any Rule 404(b) exception." The Board, however, offered the evidence to demonstrate that Judge Pendleton did not accidentally find himself without a home in his judicial district, as he claimed, but instead intended to reside with his wife for personal reasons, and absence of an accident and intent are both permissible uses under Rule 404(b). *See State v. Fardan*, 773 N.W.2d 303, 318 (Minn. 2009) (holding evidence that the defendant had shot the same gun on prior occasions was admissible under Rule 404(b) to show his intent to kill and to rebut claim the defendant accidentally fired the gun). Finally, even if this evidence was improperly admitted, Judge Pendleton has not shown this error was prejudicial, as the panel did not rely on facts about where Judge Pendleton lived in 2008 when it determined he did not reside in his judicial district in 2014. For these reasons, we conclude his due process argument is without merit.

D.

Judge Pendleton claims his due process rights were violated because the Board made new accusations that were not found in the complaint in post-hearing arguments. Judge Pendleton identifies six "new accusations," but the panel made findings about only two of them.[9] First, the panel found that Judge Pendleton lived outside of his judicial

---

[9] According to Judge Pendleton, the six "new accusations" are that he: (1) engaged in a deliberate pattern of concealing his actual residence address; (2) was not candid in communications with the Board or the Tenth Judicial District; (3) displayed a long-running pattern of concealing his residence; (4) lived outside the district in 2008;
(Footnote continued on next page.)

district in 2008. The panel, however, did not conclude this constituted judicial misconduct, nor did it rely on where Judge Pendleton lived in 2008 when it concluded that Judge Pendleton committed judicial misconduct by residing outside of his judicial district during 2014. Second, the panel found that Judge Pendleton did not communicate with others about living with his wife in Minnetonka in 2014. The panel used this as evidence to support its conclusion that Judge Pendleton committed the misconduct alleged in the complaint by failing to reside in his judicial district during part of 2014.

In order to satisfy "due process requirements, 'the charges of professional misconduct, though informal, should be sufficiently clear and specific, in the light of the circumstances of each case, to afford the respondent an opportunity to anticipate, prepare, and present his defense.' " *Kirby*, 354 N.W.2d at 415 (quoting *In re Rerat*, 224 Minn. 124, 129, 28 N.W.2d 168, 172-73 (1947)). We have not held that due process requires a complaint to allege every piece of evidence the Board will use to prove the charges of judicial misconduct alleged in the complaint, or that a complaint must disclose every argument the Board will make regarding why the panel or this court should conclude the judge committed the charges of misconduct alleged in the complaint. In this case, the complaint charged Judge Pendleton with two specific and clear acts of misconduct. The misconduct the panel concluded Judge Pendleton committed was alleged in the complaint. We therefore hold that Judge Pendleton has failed to establish that he was

(Footnote continued from previous page.)
(5) affirmatively misled the Board when describing his living arrangements; and (6) gave the Board a false explanation regarding his affidavit of candidacy.

given insufficient notice of the charges of judicial misconduct, in violation of his right to due process.

III.

Having concluded that Judge Pendleton has committed judicial misconduct, we turn to the question of sanctions. In determining the appropriate sanction, we are "guided by the principle that the purpose of judicial discipline is not to punish, but 'to protect the public by insuring the integrity of the judicial system.' " *In re Ginsberg*, 690 N.W.2d 539, 548 (Minn. 2004) (quoting *In re Miera*, 426 N.W.2d 850, 858 (Minn. 1988)). The sanction imposed "must be designed to announce our recognition that misconduct has occurred, and our resolve that similar conduct by this or other judges will not be condoned in the future." *Miera*, 426 N.W.2d at 858. We "independently review the record to determine the discipline, if any, to impose" and do not defer to the panel or the Board's recommended sanctions. *In re Karasov*, 805 N.W.2d 255, 275 (Minn. 2011).

We have previously disciplined a judge for failing to reside in her judicial district and failing to be honest and candid with the Board during a disciplinary investigation. We suspended Judge Karasov without pay for 6 months for failing to reside within her judicial district for 3 months, making an affirmative misrepresentation in a conversation with counsel for the Board, and omitting material facts about her residency in a letter she sent the Board. *Karasov*, 805 N.W.2d at 275-76. We imposed this discipline because the "case involve[d] very serious misconduct that directly undermine[d] the integrity of and the public's trust and confidence in the Minnesota judiciary." *Id.* at 275.

34

With respect to Judge Karasov's failure to comply with the constitutional residency requirement, we considered that Judge Karasov "deliberately chose to live outside her judicial district for an extended period of time." *Id.* at 276. We emphasized that the public's belief that judges follow the law is critical to the proper administration of justice. *See id.* We concluded that "[t]he public at large and parties appearing in court could legitimately question whether a judge will faithfully apply Minnesota's constitutional provisions if that judge does not conform his or her own conduct to the constitutional requirements that exist for judges." *Id.*

With respect to Judge Karasov's affirmative misrepresentation and material omissions to the Board, we explained that "[j]udges sit in judgment of others on a daily basis, wielding tremendous power as they do so." *Id.* The public's belief "that [judicial] decision makers are honest," we reasoned, is necessary to maintain public confidence in judicial determinations. *Id.* We concluded that Judge Karasov's lack of honesty with the Board "threaten[ed] a basic tenet essential to the integrity of the judicial system."

Judge Pendleton contends that his misconduct is less serious than Judge Karasov's misconduct. He argues that unlike Judge Karasov, he lacked an intent to violate the law and the ethics rules as he understood them. He contends a public censure is the appropriate discipline. The Board, on the other hand, argues that Judge Pendleton's misconduct is more serious than Judge Karasov's. The Board maintains that Judge Pendleton resided outside of his judicial district for personal convenience because he sold his townhouse for financial reasons and did not want to have to move again if his son changed schools, and then made a knowingly false statement about the location of his

35

residence in his affidavit of candidacy in order to conceal his residency outside of his judicial district. The Board asks us to suspend Judge Pendleton without pay for at least 8 months.

We agree with the Board that Judge Pendleton's misconduct is substantially more serious than Judge Karasov's misconduct. When we suspended Judge Karasov, we expressed our "lack of tolerance for a judge's failure to comply with her constitutional obligations" and for a judge's failure to act honestly and candidly with the Board. *Karasov*, 805 N.W.2d at 277. Just 2 years after we gave this clear warning and despite being fully aware of our decision in *Karasov*, Judge Pendleton deliberately chose to reside outside of his judicial district for even longer than Judge Karasov did. Judge Pendleton voluntarily decided to sell his townhouse in his judicial district, and he chose not to have a new place to live in his judicial district when that sale closed. Judge Pendleton chose to move in with his wife in Minnetonka and to remain and reside at her house indefinitely while resolving issues related to his son. Judge Pendleton consciously disregarded both his constitutional obligations and our decision in *Karasov*.

The integrity of the judicial system is seriously undermined when a judge not only violates his or her constitutional obligations but also flouts a discipline decision of our court. *See Ginsberg*, 690 N.W.2d at 549 ("Those who come before the courts cannot reasonably be expected to respect the law if those who preside on the bench are not perceived as respectful of the law."); *In re Winton*, 350 N.W.2d 337, 340 (Minn. 1984) ("Willful violations of law . . . bring[ ] the judicial office into disrepute and thereby prejudice the administration of justice."). In order for the public to have confidence in

36

the integrity of the judicial system, the public must believe that there is an effective system in place to ensure judges abide by our constitution and follow their ethical obligations and to address acts of judicial misconduct. The public's trust and confidence in the Minnesota judiciary will be eroded if the disciplinary system is unable to deter similar acts of serious misconduct by other judges. *See Miera*, 426 N.W.2d at 858 (explaining that a sanction imposed in a judicial discipline case must announce the court's "resolve that similar conduct by this or other judges will not be condoned in the future").

Judge Pendleton not only violated his constitutional obligation to reside in his judicial district, but he also made a knowingly false statement about his residency in his affidavit of candidacy. The context in which this knowingly false statement was made is especially troubling. Judicial elections have been a part of the judicial selection process since the beginning of statehood in Minnesota. *See* Minn. Const. of 1857, art. VI, §§ 3-4, 7-9. The public's belief that judicial elections are fair is therefore critical to the integrity of the judicial system. *See In re Renke*, 933 So. 2d 482, 495 (Fla. 2006) ("Those who seek to assume the mantle of administrators of justice cannot be seen to attain such a position of trust through . . . unjust means."). In his affidavit of candidacy, Judge Pendleton falsely told the voters that he resided in his judicial district, and he made this knowingly false statement in order to hide the fact that he was residing outside of his judicial district. The facts of this case demonstrate that Judge Pendleton lied to the voters, as well as to election officials and potential opponents, about whether he met a constitutional requirement to hold the office of district court judge for the Tenth Judicial

37

District and that he did so with the intent to deceive. Judge Pendleton's intentional misrepresentation is particularly serious because it was made to the voters of his judicial district and was about a fundamental requirement to hold office. *See id.* (removing a judge from office, in part, for making misrepresentations about his qualifications for office during the campaign). The integrity of the judiciary is severely undermined if a judge deceives voters by falsely representing that he or she satisfies a constitutional requirement to hold office.

In three prior cases we have exercised our power to remove a judge. *See Ginsberg*, 690 N.W.2d at 556; *Winton*, 350 N.W.2d at 340-44; *In re Gillard*, 271 N.W.2d 785, 802-05 (Minn. 1978). The misconduct in *Ginsberg* and *Winton* included criminal acts for which the judges were convicted, 690 N.W.2d at 549 (discussing criminal charges); 350 N.W.2d at 339 (noting that the judge pleaded guilty to criminal charges), while Judge Gillard's misconduct, which occurred while he was practicing law before his appointment to the bench, injured more than a dozen former clients. 271 N.W.2d at 802-05 (discussing client complaints). Judge Pendleton's acts of misconduct are different than the misconduct of these judges. But we have never stated that removal of a judge may occur only when a judge commits a crime or when his or her misconduct involves multiple clients. Instead, in deciding to remove these judges, we focused on the harm their misconduct caused to the judicial system and assessed whether removal was necessary in order to ensure the public's confidence in the integrity and fairness of the judicial system. *See Ginsberg*, 690 N.W.2d at 550 ("We conclude that any sanction short of removal would be wholly inadequate in the face of this aggregation of serious

38

misconduct."); *Winton*, 350 N.W.2d at 340, 343 (explaining that "[w]hat is critical is not what the statutes provide with respect to criminal responsibility but what the standards of ethical responsibility require of a judge" and stating that judicial ethical standards ensure the integrity of the legal system, which can function "only so long as the public, having confidence in the integrity of its judges, accepts and abides by judicial decisions"). Our task here too is to determine what level of sanction Judge Pendleton's misconduct requires in order to sustain the people's faith in the judicial system.

Considering the totality of the circumstances of this case, we hold that Judge Pendleton must be removed from office. Judge Pendleton committed two very serious violations. Each of his violations severely undermines the public's trust in their judicial system. When we assess Judge Pendleton's violations and the cumulative impact his misconduct has on the public's faith in the integrity of the judicial system, we conclude that the sanction of removal from office is the only sanction adequate to ensure that the people of Minnesota can have continued faith in the integrity of their justice system.

Effective as of the date of this opinion, Judge Pendleton is removed from his office as district court judge.

CONCURRENCE & DISSENT

STRAS, Justice (concurring in part, dissenting in part).

I join the court's opinion, except the conclusion that the appropriate sanction for Judge Pendleton's misconduct is removal from office. Based on our decision in *In re Karasov*, 805 N.W.2d 255 (Minn. 2011), I would censure Judge Pendleton and impose a 6-month suspension from judicial office without pay.